[No. A095827. First Dist., Div. Three. Sept. 30, 2002.]

SAN FRANCISCANS UPHOLDING THE DOWNTOWN PLAN et al., Plaintiffs and Appellants, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and Respondents;
FOREST CITY DEVELOPMENT, INC., et al., Real Parties in Interest and Respondents.

---

---

**COUNSEL**

Brandt-Hawley & Zoia, Brandt-Hawley Law Group and Susan Brandt-Hawley for Plaintiffs and Appellants.

Paul W. Edmondson and Elizabeth S. Merritt for National Trust for Historic Preservation, California Preservation Foundation and San Francisco Tomorrow as Amici Curiae on behalf of Defendants and Appellants.

Louise H. Renne and Dennis J. Herrera, City Attorneys, Judith A. Boyajian, John Malamut and Audrey Williams Pearson, Deputy City Attorneys, for Defendant and Respondent City and County of San Francisco.

Morrison & Foerster, Michael H. Zischke and Steven L. Vettel for Defendant and Respondent Redevelopment Agency of the City and County of San Francisco.

Coblentz, Patch, Duffy & Bass, Jonathan R. Bass and Keith Evans-Orville for Real Parties in Interest and Respondents.

## OPINION

McGUINESS, P. J.—In October 2000, the City of San Francisco (City), acting through its board of supervisors (the Board), planning commission (the Commission), redevelopment agency (the Agency) and mayor, approved the expansion of the Yerba Buena Center Redevelopment Plan to include a massive redevelopment project (the Project) planned for the site of the former Emporium store in downtown San Francisco bounded by Market, Fourth, Mission and Fifth Streets (the Emporium Site Redevelopment Area).[1] This appeal is from a judgment denying a mandamus writ petition filed by appellants San Franciscans Upholding the Downtown Plan, and five individual San Francisco residents,[2] seeking to invalidate the Project on the grounds the City and its pertinent agencies, agents and representatives abused their discretion in certifying the Project environmental impact report (EIR), amending the Yerba Buena Center Redevelopment Plan, and approving the Project, all in alleged violation of the California Environmental Quality Act (CEQA), the San Francisco Planning Code (Planning Code), the San Francisco General Plan, and the California Community Redevelopment Law.

On appeal, appellants argue that the judgment denying their writ and validating the actions of respondents must be reversed because (1) the Project was inconsistent with the San Francisco General Plan, particularly that part of it known as the Downtown Area Plan (the Downtown Plan); (2) the City and its pertinent agencies violated CEQA by certifying an inadequate EIR and approving the Project despite its significant environmental impacts and the existence of feasible alternatives; and (3) there was insufficient evidence to support the finding of "blight" necessary to incorporate the Project site into the preexisting Yerba Buena Center Redevelopment Plan and thereby exempt it from compliance with the Planning Code and General Plan. Appellants' arguments are contested by respondents—the City, Commission, Board and Agency—as well as by real parties in interest Federated Department Stores, Inc. (Federated), Bloomingdale's, Inc. (Bloomingdale's), Emporium Development, L.L.C. (Emporium Development) and Forest City Development, Inc. (Forest City).[3] In addition, a brief has been filed by the National Trust for Historic Preservation, California Preservation Foundation,

---

[1] The Emporium Site Redevelopment Area contains the Emporium department store building at 835 Market Street, eleven adjacent structures and one vacant lot fronting on Jessie and Mission Streets, and portions of the Jessie and Mission Streets' rights-of-way.

[2] The five individual plaintiffs and appellants identified in the first amended petition for writ of mandate and complaint for validation filed on December 19, 2000, are Jennifer Clary, Doug Comstock, Garrett Jenkins, Mary Anne Miller, and Gee Gee Platt.

[3] Federated, Bloomingdale's, Forest City and Emporium Development are collectively referred to as Real Parties in this opinion.

and San Francisco Tomorrow as amici curiae in support of appellants. Based on our review of the administrative record in accordance with the applicable standard of review, we conclude that the trial court's judgment must be affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

The building housing the former Emporium department store (the Building) is located at 835 Market Street between Fourth and Fifth Streets in San Francisco, with its rear facing Jessie Street, a midblock alley running parallel to and between Market and Mission Streets. Originally built in 1896, the Emporium Building was designed by San Francisco architect Albert Pissis, one of the first Americans to be trained at the École des Beaux Arts in Paris.[4] From the outset, the top five floors of the seven-story front section of the Building, originally known as the Parrott Building, were office space. For the first 10 years of the Building's existence, this office portion was the official designated seat of the California Supreme Court. The bottom two floors of the office portion on Market Street, together with the entire remainder of the Building, were devoted to the Emporium's retail space. This portion centered on a large, three-story open rotunda, 51 feet in height, ringed by a two-story pillared gallery and topped with a 102-foot-diameter ornate glass and metal dome.

The Emporium Building structurally withstood the 1906 earthquake. However, all but the sandstone 120-foot-tall Market Street facade of the original structure was thereafter destroyed by the subsequent fire. With the seven-story facade intact, the Building was rebuilt in 1908 in a similar fashion for the sole and express use of the Emporium. The facade and much of the structural steel in the original Building were reused, and all the interior arrangements remained similar. The 1908 Building, like the original one, included the seven-story office tower extending back from Market Street 65 feet, plus a four-story segment at the rear along Jessie Street. The two-story department store section extended between these higher segments. The three-story skylit rotunda surmounted by a glass dome was reconstructed. As completed, the rectangular Building was 275 feet wide and 355

---

[4]The Emporium Building was built on the former site of the campus of St. Ignatius College. Architect Pissis, who was most active between 1890 and 1910, was well known for his classically inspired, monumental stone and terra-cotta buildings. Other Pissis landmarks in San Francisco include the Flood Building (City Landmark No. 154, across Market Street from the Emporium Building at Powell Street); the Hibernia Bank Building (City Landmark No. 130 at Jones and Market Streets); the Crocker Bank Building (Market and Montgomery Streets); the White House department store (Sutter and Grant Streets); and the Mechanics Institute (Post Street between Kearny and Market Streets).

feet deep, with a large central aisle almost 40 feet wide bisecting the space between Market and Jessie Streets through the central skylit rotunda.

The Emporium department store occupied the Building continually from reconstruction in 1908 until 1996. During this period, the Emporium built or purchased several adjoining structures and made numerous changes to the main Building itself. In 1916, the Building was enlarged with a third floor added to the main retail space, opening onto the existing rotunda. In 1917, a nine-story, 200,000-square-foot annex was completed adjacent to the Jessie Street facade. Subsequently, six more buildings on the south side of Jessie Street were acquired by the Emporium. In 1933, an eighth additional building was built across Jessie Street and internally connected to the other, older warehouse buildings which had already been acquired. That same year, two pedestrian bridges across Jessie Street were completed, connecting the warehouse buildings on the Mission Street side with the older original Emporium Building on Market Street. The eight ancillary buildings were used by the Emporium for offices, storage, stocking, loading, receiving, and other activities; and generally were connected with each other and with the main Building by a system of long corridors, tunnels, bridges, stairs and elevators. Escalators were added to the Emporium Building in 1936. Various other changes were made in the 1950's, including closing off some openings on the second and third floors of the rotunda with blank panels. Between 1969 and 1970, the Emporium basement was connected to the new Bay Area Rapid Transit (BART) station at Powell Street. In 1977, the ground floor arcade windows on Market Street were removed to increase retail selling space. In 1989, the west side of the Emporium Building was opened into the new San Francisco Centre.

In 1979, as part of an survey of architecturally significant buildings, the Foundation for San Francisco's Architectural Heritage gave the Emporium Building its highest "A" rating, indicating that it was a building of the highest architectural and historical importance, one of the most important buildings in downtown San Francisco, eligible for the National Register, and of highest priority for city landmark status. The Downtown Plan, an official area plan in the larger San Francisco General Plan, rates the Building in category I of architectural significance. Category I buildings are those deemed by the General Plan to be of "highest architectural and environmental importance—buildings whose demolition would constitute an irreplaceable loss to the quality and character of downtown." The most significant features of the Building identified by the General Plan are the Market Street facade and office structure, the rotunda, and the dome. On the other hand, the Downtown Plan did not identify as significant architectural features the

rest of the interior retail section of the Emporium or the Jessie Street facade. None of the eight ancillary buildings attached to the Emporium or the other three buildings and lots included in the Emporium Site Redevelopment Area has ever been designated as an architecturally significant building by the Downtown Plan.[5] As a category I building, the Emporium Building qualifies for special protection under several provisions of the Downtown Plan and articles 10 and 11 of the Planning Code.

Sales at the Emporium declined in the 1990's. In 1995, Federated and its affiliate Bloomingdale's became the owners of the Emporium Building and the eight adjoining buildings after Broadway Stores, Inc., the former owner of the Emporium, went bankrupt. The Emporium closed in 1996 due to significant financial losses. Except for a brief period when Macy's used the ground floor of the Emporium Building for its furniture department, almost all of the building space owned by Federated in the Emporium Site Redevelopment Area has since been vacant. Two other smaller buildings not owned by Federated, located on Mission Street in the Emporium Site Redevelopment Area, are also largely vacant. According to Federated and the Agency, all that remains in these buildings are nonsalvageable fixtures, abandoned and deteriorated equipment, non-saleable inventory, temporary storage, and debris.

With the acquisition of the Emporium and its buildings, Federated and Bloomingdale's began investigating ways and means of restoring and reusing the existing Building and its eight ancillary buildings. The main Building and all eight of the ancillary structures were built between 1908 and 1955, well before the adoption of modern building codes. All were constructed either in whole or in part with unreinforced masonry walls subject to collapse in the event of a major earthquake; and none had undergone any seismic strengthening, retrofitting, or modern health, safety and accessibility upgrades. The layout of the Emporium's retail space was essentially unchanged since its construction and enlargement between 1908 and 1917, and reflected the styles and requirements of that bygone era. The Building's tightly spaced columns, insufficient floor-to-ceiling height, deficient display space, faded amenities, awkward circulation patterns and inadequate off-street loading areas rendered it functionally obsolete for purposes of contemporary department store usage. The eight ancillary buildings were awkwardly configured for convenience or any efficient usage, and even more dilapidated and unserviceable than the main Building.

---

[5]Aside from the Emporium Building, the other 11 buildings included in the Emporium Site Redevelopment Area are the Emporium Annex, the Emporium Marking Building, the West Dungeon, the East Dungeon, Hotel Del Mar, the Red Cross Building, the Hulse Bradford Building, the Milwaukee Furniture Building, the American Type Foundry Building, and two unnamed buildings located at 327 Jessie Street and 828 Mission Street.

In view of the prohibitive expense of remedying these structural problems and bringing the Building up to modern codes and standards, Federated concluded after thorough analysis that the financial investment required to rehabilitate the existing Emporium Building and its associated properties for use as a Bloomingdale's department store could not be economically justified by the anticipated return on such an investment. Federated consequently sought a partner to help it develop a project that could generate sufficient revenues to be financially feasible, and still preserve as much as possible of the architecturally significant features of the Emporium Building. Federated entered into an agreement with Forest City to redevelop the Building and its ancillary structures. Forest City prepared a plan for redevelopment of the Emporium and its auxiliary buildings which it believed was financially viable, but only with public economic assistance. The Project called for the replacement of most of the Emporium Building and all of the ancillary structures with new construction to house a new Bloomingdale's department store, a cinema, entertainment and restaurant space, other retail space, office space, and a hotel, while preserving some portions of the original Emporium Building.

Federated and Forest City then approached the City with the proposed Project to seek inclusion of the nine buildings in a new or existing redevelopment area in order to obtain Agency redevelopment assistance. Acting through the Agency, the planning department and the Commission, the City commenced a multiyear economic and environmental analysis of the Project in order to determine whether to offer it public redevelopment assistance. In July 1998, the planning department published notice that the Project would require an EIR.

The EIR analyzed the proposed Project and five other alternatives involving reduced demolition of or changes to the existing buildings. These alternative projects included no change at all to the buildings (Alternative A, No Project); a reduced project with no hotel included (Alternative B, Reduced Development); a project designed to preserve as much as possible of the existing historic structures (Alternative C, Conservative Preservation); a project involving somewhat less preservation of existing structures (Alternative D, Modified Preservation); and a project designed in accordance with existing planning controls (Alternative E, Existing Planning Controls). The EIR compared and analyzed in detail the relative environmental impacts and costs of the proposed Project with these various alternatives. It concluded that the Project would have significant adverse environmental impacts on architectural and historical resources due to the demolition and/or alteration of large portions of the Emporium Building, as well as significant environmental impacts on traffic and air quality. To address these impacts the EIR proposed various mitigating measures.

Real Parties contracted with the Sedway Group (Sedway), a San Francisco real estate economics consulting firm, to conduct a series of analyses of the economic impacts and feasibility of the Project as well as the five alternatives addressed by the EIR, including rehabilitation and preservation of the existing Emporium Building. In consultation with the City's independent expert Keyser Marston Associates, Inc. (KMA), the city architect and the planning department, and using construction cost estimates developed by the construction management firm of Swinerton & Walberg, Sedway concluded that the Emporium Building would cost more to rehabilitate than it would thereafter be worth on the market, and that the Building therefore had a *negative* market value. In consequence, the Real Parties' proposed Project would be financially infeasible without public subsidies. However, the subsidies required for the preservation alternatives considered by the EIR would be significantly greater than that required for the proposed Project. The City's expert KMA independently reviewed Sedway's analysis and conclusions. Like Sedway, KMA also concluded that in view of its condition and the costs of rehabilitation, the Emporium Building had no substantial remaining market value; all the preservation alternatives would be financially infeasible without public assistance; and the proposed Project would be the least costly solution, minimizing the amount of public subsidies required to render the Building usable and financially viable.

The Commission and the Agency published and circulated the draft EIR for the Project in October 1998. A comment period followed, and a public hearing on the draft EIR was held in December 1998. In response to public comments, Real Parties modified the Project to retain more of the Emporium Building's historic features than originally proposed. Among other things, the Project was revised to retain virtually the entire historic seven-story office block extending 65 feet in depth back from Market Street; and to reduce the number of feet the restored dome would be raised from 72 feet to 55 feet, thereby preserving the floor-to-dome height and architectural elements, proportions, and dimensions of the 1908 rotunda. In addition, a proposed pedestrian bridge over Mission Street was eliminated, the sidewalk facing Mission Street was widened, the space proposed for cinema and other entertainment usage was reduced, and Real Parties pledged to make a $1.25 million contribution for BART/MUNI Powell Street station improvements plus a $1.5 million contribution to the City for parking solutions in the South of Market Street (SOMA) area.

In August 1999, a supplement to the draft EIR incorporating and analyzing these revisions was published, with another public comment period and hearing following. The Commission and the Agency published and circulated a summary of comments and responses to the draft EIR and its

Supplement on December 28, 1999, including written responses to all the comments received during the 45-day review period for the draft EIR and the subsequent 45-day review period for the supplement to the draft EIR. Following a joint public hearing, the final EIR was certified by the Commission and the Agency on January 13, 2000. In June 2000, the planning department prepared an addendum to the EIR analyzing minor Project revisions, and concluded the revisions would not alter the EIR's previous conclusions.

On August 15, 2000, the Agency adopted CEQA findings and a statement of overriding considerations, determined the Project site was physically and economically blighted under the Community Redevelopment Law (Health & Saf. Code, § 33000 et seq.), and approved the Yerba Buena Center Redevelopment Plan amendment expanding the redevelopment area to include the Project site. The Agency recommended that the Board approve the Project. Two days later, the Commission similarly adopted CEQA findings and a statement of overriding considerations, based on the final EIR, the addendum thereto, planning department staff reports, public comments, and reports and studies on the Project. In addition, the Commission determined the Project would be consistent with the General Plan and its priority policies, and recommended that the Board approve the Project.

Finally, on September 25, 2000, after considering the entire administrative record including the final EIR, the addendum thereto, the economic analyses, reports and studies of the Project, the Agency and Commission determinations, written comments and letters from the public and hours of testimony for and against the Project, the Board certified the final EIR and adopted CEQA findings and a statement of overriding considerations for the Project. Two weeks later the Board, with only one dissenting vote, approved the Project and adopted the Yerba Buena Center Redevelopment Plan amendment expanding the redevelopment area to include the Project site.

Relying on the evidence and analyses in the administrative record, the Board adopted the findings of the Agency and the Commission rejecting Alternatives A through E as infeasible for financial and other reasons, and concluding that the overriding substantial economic, social, public welfare and safety benefits of the Project outweighed its otherwise significant adverse environmental impacts. Among other things, the benefits of the Project included (1) preserving the Emporium Building's most significant architectural and historical features; (2) revitalizing the entire Emporium Site Redevelopment Area; (3) providing over $16 million for affordable housing; (4) providing approximately $14 million per year in projected net tax revenues

to the City; (5) creating approximately 3,400 new jobs; (6) providing $1.25 million for transit improvement measures, $1.5 million for parking solutions in the SOMA area, $250,000 for improvements to the Hallidie Plaza area and $50,000 in open space fees; and (7) creating a publicly accessible rooftop garden. Finally, the Board concluded that demolition of portions of the Emporium Building, as proposed by the Project, would not be inconsistent with the historic preservation policies of the Downtown Plan because a fully rehabilitated Emporium Building would have a negative market value of between negative $2.3 million and negative $5.5 million after taking into account the high costs of rehabilitation and the difficulty of using the antiquated design for modern department store purposes.

The City filed a notice of determination of project approval on October 23, 2000. Appellants filed a petition for writ of mandate and complaint to invalidate the amendment to the redevelopment plan on November 22, 2000, and an amended petition on December 19, 2000. Following two hearings on the amended petition on May 17 and 31, 2001, the trial court denied the petition in its entirety and granted judgment of validation in favor of the City and the Agency. This appeal timely followed entry of judgment.

### SCOPE AND STANDARD OF REVIEW

The petition for writ of administrative mandamus in this case broadly challenged the actions taken by the City, the Board and the responsible City agencies with respect to three distinct issues. First, appellants challenged the Project's compliance and consistency with the City's General Plan. Second, appellants challenged the EIR's compliance with CEQA and the City's certification of the Project EIR. Third, appellants contended the City's approval of the amendments to the Yerba Buena Center Redevelopment Plan to include and accommodate the Emporium Site Redevelopment Area was in violation of the Community Redevelopment Law (Health & Saf. Code, § 33000 et seq.). Appellants repeat these arguments on appeal from the trial court's judgment denying their petition.

■ The inquiry for the issuance of a writ of administrative mandamus is whether the agency in question prejudicially abused its discretion; that is, whether the agency action was arbitrary, capricious, in excess of its jurisdiction, entirely lacking in evidentiary support, or without reasonable or rational basis as a matter of law. (Code Civ. Proc., § 1094.5, subds. (b), (c); *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 10-12 [78 Cal.Rptr.2d 1, 960 P.2d 1031]; *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1132-1133 [26

Cal.Rptr.2d 231, 864 P.2d 502]; *Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 712, 717 [29 Cal.Rptr.2d 182] (*Sequoyah Hills*); *Corona-Norco Unified School Dist. v. City of Corona* (1993) 17 Cal.App.4th 985, 992 [21 Cal.Rptr.2d 803] (*Corona-Norco*).) A prejudicial abuse of discretion is established if the agency has not proceeded in a manner required by law, if its decision is not supported by findings, or if its findings are not supported by substantial evidence in the record. We may neither substitute our views for those of the agency whose determination is being reviewed, nor reweigh conflicting evidence presented to that body. (Pub. Resources Code, § 21168.5; Code Civ. Proc., § 1094.5, subd. (b); *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 567-569 [38 Cal.Rptr.2d 139, 888 P.2d 1268] (*Western States*); *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161] (*Goleta Valley II*); *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392, fn. 5 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights I*); *Sequoyah Hills, supra,* 23 Cal.App.4th at pp. 712, 717; *Concerned Citizens of Calaveras County v. Board of Supervisors* (1985) 166 Cal.App.3d 90, 95-96 [212 Cal.Rptr. 273].)

On appeal, we are governed by the same abuse of discretion standard in pursuing essentially the same task as that of the trial court. Like the trial court, we review the agency's actions and decisions to determine whether they were in compliance with the procedures required by law and were supported by findings which themselves were supported by substantial evidence in light of the entire administrative record. In so doing, our review is de novo, and not bound by the trial court's conclusions. The decisions of the agency are nevertheless given substantial deference and presumed correct. The parties seeking mandamus bear the burden of proving otherwise, and the reviewing court must resolve reasonable doubts in favor of the administrative findings and determination. (Pub. Resources Code, § 21167.3; *Laurel Heights I, supra,* 47 Cal.3d at p. 393; *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 116-117 [104 Cal.Rptr.2d 326] (*Save Our Peninsula*); *Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency* (2000) 82 Cal.App.4th 511, 523 [98 Cal.Rptr.2d 334] (*Friends of Mammoth*); *Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 113-114 [62 Cal.Rptr.2d 612]; *Sequoyah Hills, supra,* 23 Cal.App.4th at pp. 712, 717; *State of California v. Superior Court* (1990) 222 Cal.App.3d 1416, 1419 [272 Cal.Rptr. 472]; *Concerned Citizens of Calaveras County v. Board of Supervisors, supra,* 166 Cal.App.3d at p. 96.)

In the context of an administrative mandamus action challenging an agency's determination under CEQA or the applicable general plan, "substantial evidence" means "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Cal. Code Regs., tit. 14, § 15384, subd. (a); *Laurel Heights I, supra,* 47 Cal.3d at p. 393.) Such substantial evidence may include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts, but not argument, speculation, unsubstantiated opinion, or clearly erroneous evidence. (Pub. Resources Code, §§ 21080, subd. (e), 21082.2, subd. (c).) ■ Similarly, in reviewing an agency's adoption of a redevelopment plan or amendment under the Community Redevelopment Law, we must determine whether substantial evidence in the administrative record supports the agency's specific findings of urbanization and blight. (Health & Saf. Code, §§ 33030, 33031, 33320.1; *Friends of Mammoth, supra,* 82 Cal.App.4th at p. 538; *Morgan v. Community Redevelopment Agency* (1991) 231 Cal.App.3d 243, 257 [284 Cal.Rptr. 745] *(Morgan).)*

## CONSISTENCY WITH THE GENERAL PLAN

■ Appellants first contend that the City's approval of the Project and redevelopment plan amendments was irreconcilably inconsistent with the San Francisco General Plan. At issue are mandatory provisions of the Downtown Plan specifically requiring retention and preservation of the "highest quality buildings," defined in the Downtown Plan as "Significant Buildings," or "[t]hose buildings of the highest architectural and environmental importance—buildings whose demolition would constitute an irreplaceable loss to the quality and character of downtown." These Significant Buildings, which "would be required to be retained," are in turn divided into two classifications, category I and category II, with somewhat more substantial alteration of the latter permitted than of the former. Demolition of a Significant Building "would be permitted only if public safety requires it or, in taking into account the value of TDR [transferable development rights],[6] the Building retains no substantial remaining market value."[7] Under the Planning Code, the Emporium Building is classified at the highest level as a

---

[6] Intended as an incentive for historical preservation, TDR's are a means whereby the owners of historic properties may offset some of the costs of historic preservation and restoration by selling their rights to demolish those properties, thereby transferring such unused development rights to other property owners who can then use those rights to increase the development potential of other less historically significant properties. (Planning Code, §§ 128, 1109.)

[7] Under the heading "Preserving the Past," the Downtown Plan states the objective (Objective 12) of "conserv[ing] resources that provide continuity with San Francisco's past." To

category I Significant Building. Like the Downtown Plan, the Planning Code provides that a category I building may not be demolished unless it is determined that, taking into account the value of transferable development rights and costs of rehabilitation, "the property retains no substantial remaining market value or reasonable use."[8] (Planning Code, § 1112.7.)

---

achieve this objective, the Downtown Plan sets out three polices: (1) to "[p]reserve notable landmarks and areas of historic, architectural, or aesthetic value, and promote the preservation of other buildings and features that provide continuity with past development"; (2) to "[u]se care in remodeling significant older buildings to enhance rather than weaken their original character"; and (3) to "[d]esign new buildings to respect the character of older development nearby."

As "Key Implementing Action" to carry out these policies, the Downtown Plan sets out the following: "Require retention of the highest quality buildings and preservation of their significant features. Provide incentives for retention of other highly rated buildings, and encourage retention of their significant features."

In pertinent part, the Downtown Plan discusses "Significant Buildings" as follows: "Those buildings of the highest architectural and environmental importance—buildings whose demolition would constitute an irreplaceable loss to the quality and character of downtown—would be required to be retained. There are 251 of these buildings. They include all buildings classified as Buildings of Individual Importance and rated as excellent in architectural design, or very good in both architectural design and relationship to the environment. [¶] These buildings—referred to in the Plan as Significant Buildings—are divided into Category I and Category II, the difference being in the extent of alteration allowed. There are 209 significant buildings in Category I and 42 significant buildings in Category II. [¶] Significant buildings in Category II can accommodate, because of their depth, more substantial alteration of the back of the building without affecting the building's architectural qualities or appearance or their ability to function as separate structures. Most of these buildings are on deep interior lots with non-architecturally treated side and rear walls. The alteration could be a rear addition to the building visible from the street, a new, taller building cantilevered over the back of the building, or replacement of the rear of the building with a separate, taller structure. . . . [¶] Demolition of a Significant Building would be permitted only if public safety requires it or, in taking into account the value of TDR, the Building retains no substantial remaining market value. [¶] Changes in the facade, or significant exterior features or interior features designated as landmarks would be reviewed for their consistency with the architectural character of the building by applying criteria, based in part on the Secretary of the Interior's Standards for Rehabilitation. [¶] Owners of significant buildings would be required to comply with all applicable codes, laws and regulations governing the maintenance of property in order to preserve the buildings from deliberate or inadvertent neglect."

[8]Article 11 of the Planning Code is intended to maintain buildings and areas "of special architectural, historical and aesthetic character" within the C-3 (downtown) district of San Francisco. Section 1103.1 designates the Kearny-Market-Mason-Sutter Conservation District, in which the Emporium Building is located. The Emporium Building is listed as a category I Significant Building in the C-3 district. The Planning Code goes on in section 1111.6 thereof to set strict guidelines and standards for reviewing any proposed alterations to category I Significant Buildings. Among other things, these rules require that any alterations be consistent with the existing architectural character of the building, and prohibit the damaging or destroying of "[t]he distinguishing original qualities or character of the building."

The Planning Code lists the Emporium Building as a category I Significant Building, and provides that the demolition of a category I may not be approved unless "(1) it is determined

Although the City adopted many amendments to the General Plan regarding the Emporium Site Redevelopment Area to enable the Project to proceed despite its apparent inconsistency with the General Plan and the Planning Code, it did not amend the Downtown Plan's requirement that there be no demolition of category I buildings unless required by public safety, or upon a finding of "no substantial remaining market value." Appellants insist that the Project remains unlawfully inconsistent with the San Francisco General Plan's protection for downtown historic resources, claiming that respondents failed to provide a sufficient basis for the essential determination that the Emporium Building had no substantial remaining market value.

■ The standard for judicial review of administrative decisions by local public agencies with respect to consistency with applicable general plans "is whether the local adopting agency has acted arbitrarily, capriciously, or without evidentiary basis." (*Concerned Citizens of Calaveras County v. Board of Supervisors, supra,* 166 Cal.App.3d at p. 96.)[9] "A city's findings that [a] project is consistent with its general plan can be reversed only if [they are] based on evidence from which no reasonable person could have reached the same conclusion. [Citation.]" (*A Local & Regional Monitor v. City of Los Angeles* (1993) 16 Cal.App.4th 630, 648 [20 Cal.Rptr.2d 228].) Moreover, because the question of substantial compliance with the general plan is one of law, this court need not give deference to the conclusion of the trial court. (*Concerned Citizens of Calaveras County v. Board of Supervisors, supra,* 166 Cal.App.3d at p. 96; *Twain Harte Homeowners Assn. v. County of Tuolumne* (1982) 138 Cal.App.3d 664, 671, 674 [188 Cal.Rptr. 233].)

On the other hand, courts accord great deference to a local governmental agency's determination of consistency with its own general plan, recognizing that "the body which adopted the general plan policies in its legislative

---

that under the designation, taking into account the value of Transferable Development Rights and costs of rehabilitation to meet the requirements of the Building Code or other City, State or federal laws, the property retains no substantial remaining market value or reasonable use; or (2) the Superintendent of the Bureau of Building Inspection or the Chief of the Bureau of Fire Prevention and Public Safety determines, after consultation, to the extent feasible, with the Department of City Planning, that an imminent safety hazard exists and that demolition of the structure is the only feasible means to secure the public safety." (Planning Code, § 1112.7.) On the other hand, the Planning Code does *not* list the Emporium Building or any of the other buildings on the Project site as historical landmarks.

[9]A public agency's determination that a project is consistent with its general plan "comes to this court with a strong presumption of regularity. [Citation.] To overcome that presumption, an abuse of discretion must be shown. [Citations.] An abuse of discretion is established only if the [agency] has not proceeded in a manner required by law, its decision is not supported by findings, or the findings are not supported by substantial evidence. (Code Civ. Proc., § 1094.5, subd. (b).) We may neither substitute our view for that of the [agency], nor reweigh conflicting evidence presented to that body. [Citation.]" (*Sequoyah Hills, supra,* 23 Cal.App.4th at p. 717.)

capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citations.] Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes. [Citations.] A reviewing court's role 'is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies.' [Citation.]" (*Save Our Peninsula, supra,* 87 Cal.App.4th at p. 142.)

Moreover, state law does not require precise conformity of a proposed project with the land use designation for a site, or an exact match between the project and the applicable general plan. (*Sequoyah Hills, supra,* 23 Cal.App.4th at p. 717; *Greenebaum v. City of Los Angeles* (1984) 153 Cal.App.3d 391, 406-407 [200 Cal.Rptr. 237].) Instead, a finding of consistency requires only that the proposed project be "*compatible* with the objectives, policies, general land uses, and programs specified in" the applicable plan. (Gov. Code, § 66473.5, italics added.) The courts have interpreted this provision as requiring that a project be " 'in agreement or harmony with' " the terms of the applicable plan, not in rigid conformity with every detail thereof. (*Sequoyah Hills, supra,* 23 Cal.App.4th at p. 718; *Greenebaum v. City of Los Angeles, supra,* 153 Cal.App.3d at p. 406; 59 Ops.Cal.Atty.Gen. 129, 131 (1976).)[10]

In this case, the Board expressly determined that the Project was consistent with the General Plan, including the Downtown Plan and its priority policies. These include not only historic preservation, but also "space for commerce"; the maintenance and improvement of the City's "position as a prime location for financial, administrative, corporate, and professional activity"; the improvement of the City's "position as the region's prime location for specialized retail trade"; the provision and support,

[10]"Indeed, it is beyond cavil that no project could completely satisfy every policy stated in the [general plan], and that state law does not impose such a requirement. [Citations.] A general plan must try to accommodate a wide range of competing interests—including those of developers, neighboring homeowners, prospective homebuyers, environmentalists, current and prospective business owners, jobseekers, taxpayers, and providers and recipients of all types of city-provided services—and to present a clear and comprehensive set of principles to guide development decisions. Once a general plan is in place, it is the province of elected city officials to examine the specifics of a proposed project to determine whether it would be 'in harmony' with the policies stated in the plan. [Citation.] It is, emphatically, *not* the role of the courts to micromanage these development decisions. Our function is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies, whether the city officials made appropriate findings on this issue, and whether those findings are supported by substantial evidence. [Citations.]" (*Sequoyah Hills, supra,* 23 Cal.App.4th at pp. 719-720, italics in original.)

"within acceptable levels of density," of expanded downtown commercial space; creation of "an urban form for downtown that enhances San Francisco's stature as one of the world's most visually attractive cities"; increased public transit use; and seismic safety. Adopting the conclusions of the Commission and its staff, the Board found the Project consistent with these objectives and policies of the Downtown and General Plans, including specifically the preservation of historic resources. ▆ The Board's reading of its own General Plan "comes to this court with a strong presumption of regularity." (*Sequoyah Hills, supra,* 23 Cal.App.4th at p. 717.) In evaluating whether the Board abused its discretion, we are obliged to give its finding of consistency great deference, without substituting our own views for those of the Board, or reweighing conflicting evidence in the record. (*Ibid.; Save Our Peninsula, supra,* 87 Cal.App.4th at p. 142.)

▆ The administrative record shows that in the process of formulating and amending the Project, great efforts were made to preserve the most significant historical aspects of the Emporium Building. Thus, the historic facade and office portion facing Market Street, as well as the large rotunda and dome are to be preserved and indeed restored. To this extent, therefore, the proposed Project made significant efforts to satisfy the preservation policies of the Downtown Plan as well as the sometimes conflicting policies favoring the development of financially viable commercial and retail space.

Nevertheless, in order to provide a financially viable space for the new Bloomingdale's store, the Project proposed by the Real Parties envisions demolishing a significant portion of the original Building. As the EIR itself recognizes, this "demolition of most of the building and alteration of other architectural elements would constitute a significant adverse impact" of the Project. Because the Downtown Plan permits demolition of historically significant buildings only if public safety requires it or if the building retains no substantial remaining market value, and because neither respondents nor Real Parties contend that demolition of the present Emporium Building is necessary for public safety, the proposed Project can only be construed as consistent with the General Plan if the Building itself retains no substantial remaining market value. The issue presented here is therefore whether the City's findings and determination approving the Project were supported by substantial evidence that the Emporium Building in fact has no substantial remaining market value.

In making this determination, the City relied on the expert analyses of Sedway and KMA. Each consultant independently concluded that, even after taking into account all possible monetary incentives for historic preservation, the substantial costs of rehabilitating and preserving the Emporium

Building would be millions of dollars more than the value the Building could thereafter generate in its existing configuration, through any plausible revenue-producing usage, whether retail, office or residential. Under these circumstances, the Building has no remaining market value.

In coming to this conclusion, Sedway examined five different development alternatives involving preservation of the historic Emporium Building: (1) the "Mostly Retail Scenario," in which the Emporium Building would be historically renovated primarily for retail usage and some office space; (2) the "Mostly Office Scenario," in which the Building would be historically renovated primarily for office space and some retail use on the first two floors; (3) historical renovation of the Building for residential use only; (4) historical renovation of the Building for use as a single large upscale department store; and (5) historical renovation of the Building for use as a single large retail store focusing on household goods, such as Target or Kmart. Sedway performed detailed economic analysis only on the first two of these scenarios after initial consideration led to the conclusion the last three were infeasible from both a financial and a market perspective.[11]

Sedway's comprehensive analysis of the two remaining alternatives subtracted the estimated development costs from the estimated value of the historically rehabilitated Building under either scenario, taking into account all projected costs of rehabilitation, the probable future revenue stream from the completed development, and the available monetary incentives for historic restoration and preservation, including potential historic tax credits and TDR's associated with the property in the Emporium Site Redevelopment Area. Under either alternative, Sedway concluded that the developer would incur approximately $130 million in construction costs. Against this, Sedway weighed the value of the rehabilitated Building, based on the capitalized value of future net operating income plus available TDR's and historic tax credits. Complete rehabilitation of the Emporium Building in accordance with accepted standards of historic preservation and modern seismic safety

---

[11]Sedway's report nevertheless discussed these three rejected development options at some length to explain the reasons for rejecting them. The all-residential conversion option was rejected for legal, practical and market feasibility reasons because of the impossibility of providing all the residential units with windows and the difficulty of providing any parking facility in the existing Building. The single department store option was rejected because of the decrease in the number of large upscale department stores nationwide, the absence of any such stores seeking buildings as large as the Emporium Building, the marketplace reality that department stores typically seek "anchor" status locations in multiretail shopping centers in order to leverage financial benefits therefrom, and the difficulty of obtaining sufficient retail sales to justify the cost of occupying such a large space. The single large housewares store option was rejected for similar reasons, and because such a use would be inappropriate for the Building.

codes would leave in place all the inefficient and obsolete aspects of the Building's design and configuration, resulting in serious limitations on feasible space utilization and a consequent reduction in potential rental income. Sedway estimated the value of the future income stream from either potential development alternative at approximately $104.5 million. Even factoring in an additional total of approximately $23 million in the value of TDR's and historic preservation tax credits, and assuming the land and existing Building were available for free, the costs of rehabilitation, development and operation would therefore exceed any anticipated future revenue stream by $2.3 million to $5.5 million. Thus, under any historic preservation scenario, the Emporium Building would necessarily have a net *negative* value of several million dollars. Because the cost of rehabilitation would exceed the projected value of the rehabilitated asset, Sedway concluded the existing historic Building had no substantial remaining market value.

Sedway's report, analysis, and conclusions were independently verified and confirmed by KMA, the City's independent real estate valuation expert. Specifically, KMA reported that: (1) the "investment methodology fundamental to [Sedway's analysis] is the method commonly utilized in the industry and well accepted as a way to identify the residual value, if any, for the Emporium Building"; (2) it had consulted with the city architect to validate the cost data utilized in the Sedway report; (3) it had met with representatives of the construction and development industries to discuss the proposed Project; and (4) it had reviewed "independent information available as to key factors of this project" including retail industry trends, development costs, and market changes. After conducting this review, KMA independently concluded that "the analysis, conclusions and underlying assumptions in the Sedway report are reasonable," and "the Emporium Building property retains no substantial remaining market value." The City Architect also conducted an independent review of Sedway's report and analysis, and verified its estimates of construction costs. Finally, the City Planning Commission reviewed the report and also concluded the Project was consistent with the Downtown Plan.

Significantly, appellants are unable to point to *any* contrary economic evidence in the entire administrative record. Even if they had done so, however, the City's finding of no substantial remaining market value would still have to be affirmed. The conclusions and opinions of the two real estate valuation experts, Sedway and KMA, constitute substantial evidence in support of the City's administrative findings and determination that the Emporium Building retains no substantial remaining market value. (*Lewis v. Seventeenth Dist. Agricultural Assn.* (1985) 165 Cal.App.3d 823, 831 [211

Cal.Rptr. 884] [agency "may use the opinion evidence of experts as substantial evidence on which to base such a decision"]; *Coastal Southwest Dev. Corp. v. California Coastal Zone Conservation Com.* (1976) 55 Cal.App.3d 525, 532 [127 Cal.Rptr. 775] ["opinion evidence of experts . . . is substantial evidence upon which . . . administrative decision may be based"].)

■ In default of having produced any evidence to contradict the opinions of the experts, appellants instead argue that the expert analyses of Sedway and KMA should be disregarded for a variety of procedural reasons. None of appellants' proffered arguments withstands analysis.

Appellant' principal contention is that the economic analysis produced by Sedway and KMA was inadequate, untrustworthy and insufficient to support the City's Project approval because it allegedly did not contain all the information required by article 11 of the San Francisco Planning Code for a permit application to demolish an historic category I building. Specifically, appellants contend that any analysis of whether a given property retains any substantial remaining market value must take into account the dozen or so prescribed factors enumerated in sections 1112.1 and 1112.7 of the Planning Code.[12] These include among other things the purchase price of the property, the date of purchase, the most recent assessed value, real estate taxes, annual

[12]Planning Code section 1112.1 provides in pertinent part as follows: "Applications for a permit to demolish any Significant . . . Building or any building in a Conservation District shall comply with the provisions of Section 1006. 1 of Article 10 of this Code [setting forth technical procedural requirements for filing applications for certificate of appropriateness with the Department of City Planning].

"In addition to the contents specified for applications in Section 1006.1 of Article 10, any application for a permit to demolish a Significant Building . . . on the grounds stated in Section 1112.7(a)(1), shall contain the following information:

"(a) For all property:

"(1) The amount paid for the property;

"(2) The date of purchase, the party from whom purchased, and a description of the business or family relationship, if any, between the owner and the person from whom the property was purchased;

"(3) The cost of any improvements since purchase by the applicant and date incurred;

"(4) The assessed value of the land, and improvements thereon, according to the most recent assessments;

"(5) Real estate taxes for the previous two years;

"(6) Annual debt service, if any, for the previous two years;

"(7) All appraisals obtained within the previous five years by the owner or applicant in connection with his or her purchase, financing or ownership of the property;

"(8) Any listing of the property for sale or rent, price asked and offers received, if any;

"(9) Any consideration by the owner for profitable and adaptive uses for the property, including renovation studies, plans, and bids, if any; and

"(b) For income-producing property:

"(1) Annual gross income from the property for the previous four years;

"(2) Itemized operating and maintenance expenses for the previous four years;

debt service, operating and maintenance expenses, recent appraisals, studies or bids for profitable and adaptive uses of the property, and available TDR's. The ultimate calculation of market value is then referred for decision to the Commission and the City Landmarks Board. (Planning Code, §§ 1112.1, 1112.5 to 1112.7.) Because neither Sedway nor KMA used or considered all the factors enumerated in the Planning Code, appellants contend the City failed properly to determine the actual market value of the Building, which therefore cannot be exempted from the provisions of the Downtown and General Plans.

Appellants' argument founders on their own admission that the provisions of the Planning Code do not apply to this redevelopment project. Only if we set aside the City's finding of blight and determine that the Project was approved in violation of the Community Redevelopment Law would the provisions of the Planning Code become pertinent to this case. Neither does the Downtown Plan incorporate article 11 of the Planning Code. Thus, the provisions of the Planning Code are essentially irrelevant to the validity of the City's approval of the subject Project.

Even if the Planning Code did apply, its provisions do not set out any method, much less an exclusive method, for *evaluating* commercial properties proposed for demolition or redevelopment. The relevant provisions of the Planning Code simply require that certain information be provided in any application for a demolition permit; they do not provide any guidance on how the City is to weigh and analyze the information provided. The only

---

"(3) Annual cash flow for the previous four years.

"Applications for the demolition of any Significant . . . Building shall also contain a description of any Transferable Development Rights or the right to such rights which have been transferred from the property, a statement of the quantity of such rights and untransferred rights remaining, the amount received for rights transferred, the transferee, and a copy of each document effecting a transfer of such rights."

Planning Code section 1112.7 provides in pertinent part as follows: "The Board of Permit Appeals, the City Planning Commission, the Director of Planning, and the Landmarks Board shall follow the standards in this Section in their review of applications for a permit to demolish any Significant . . . Building from which [TDR's] have been transferred.

"No demolition permit may be approved unless: (1) it is determined that under the designation, taking into account the value of [TDR's] and costs of rehabilitation to meet the requirements of the Building Code or other City, State or federal laws, the property retains no substantial remaining market value or reasonable use; or (2) the Superintendent of the Bureau of Building Inspection or the Chief of the Bureau of Fire Prevention and Public Safety determines, after consultation, to the extent feasible, with the Department of City Planning, that an imminent safety hazard exists and that demolition of the structure is the only feasible means to secure the public safety. Costs of rehabilitation necessitated by alterations made in violation of Section 1110, by demolition in violation of Section 1112, or by failure to maintain the property in violation of Section 1117, may not be included in the calculation of rehabilitation costs under Subsection (1)."

requirement stated by the Planning Code with respect to the question of whether to approve demolition of a Significant Building is the same as that set out in the Downtown Plan, namely, whether, "taking into account the value of [TDR's] and costs of rehabilitation to meet the requirements of the Building Code or other City, State or federal laws, the property retains no substantial remaining market value or reasonable use." (Planning Code, § 1112.7.) This is, of course, the same question addressed in the analyses prepared by Sedway and KMA, and used by the City in making its ultimate determination to approve the Project. This standard for demolition was satisfied by the findings of both the Sedway and KMA reports.

Appellants nevertheless contend Sedway's report cannot constitute substantial evidence because, rather than providing objective analysis, Sedway instead was a paid consultant hired by Real Parties to produce a biased, self-serving study aimed at a predetermined result. This assertion is meritless. The courts have specifically rejected similar assertions that decisions of public agencies are tainted by input from economic analysts and experts retained by the interested parties. (*City of Poway v. City of San Diego* (1984) 155 Cal.App.3d 1037, 1042 [202 Cal.Rptr. 366] [rejecting CEQA challenge to EIR principally prepared by developer, where record showed the city exercised independent judgment before approving project]; *Foundation for San Francisco's Architectural Heritage v. City and County of San Francisco* (1980) 106 Cal.App.3d 893, 908 [165 Cal.Rptr. 401] [EIR not fatally undermined by direct participation of developer and paid experts in underlying studies and analysis].) In this case, KMA and the city architect both provided an independent review and corroboration of Sedway's analysis. Together, their reports constituted substantial evidence in support of the City's ultimate decision that the Emporium Building retained no substantial remaining market value and approval of the project was therefore consistent with the General Plan.

Alternatively, appellants assert that Sedway could not accurately estimate the value of the Emporium Building without actually putting it on the market. The approach utilized by Sedway employed established, widely-accepted methodologies for valuation of real estate in compliance with commonly accepted commercial real estate appraisal practice recognized by the American Institute of Real Estate Appraisers and the courts. (*De Luz Homes, Inc. v. County of San Diego* (1955) 45 Cal.2d 546, 564-568 [290 P.2d 544]; American Inst. Real Estate Appraisers, The Appraisal of Real Estate (11th ed. 1996) 449, 453-454.) The market value of commercial properties that derive their worth from the income they are capable of producing is generally calculated by means of the income capitalization approach, an appraisal technique that recognizes that buyers invest in income-producing

properties with the expectation of receiving a return on their investment. The appraisal method by comparable sales, generally used for estimating the market value of single-family residential property, is not often useful in valuing large commercial properties, where the critical issue is the income the property is capable of producing. Such an approach would be particularly useless in a case such as this, in which the building in question has never been sold and is not currently for sale, and there is no evidence in the record of any comparable properties in the City, much less any such properties that are for sale.

In any event, there is nothing unusual in Sedway's analysis or conclusions. As many cases have witnessed, it is well established that impaired property may have little or no market value if the costs of necessary repairs, remediation or rehabilitation would approximate or exceed the value of the property in its repaired or rehabilitated condition. (*Mola Development Corp. v. Orange County Assessment Appeals Bd.* (2000) 80 Cal.App.4th 309, 318-320 [95 Cal.Rptr.2d 546]; *Westling v. County of Mille Lacs* (Minn. 1996) 543 N.W.2d 91, 92-93; *Commerce Holding Corp. v. Assessors of Babylon* (1996) 88 N.Y.2d 724, 728-732 & fn. 5 [649 N.Y.S.2d 932, 673 N.E.2d 127].)

Appellants also suggest that the Sedway report must be rejected as inadequate because it only analyzed two hypothetical commercial project alternatives. This suggestion is baseless. Sedway initially identified five potential uses of the Building in an historically rehabilitated state. Three of these alternatives were then ruled out, on the basis of Sedway's preliminary analysis finding them entirely infeasible for practical, financial and market reasons. It then concentrated its analysis on the two remaining preservation scenarios that might actually be economically viable. After conducting a comprehensive analysis of these two potentially viable alternatives, Sedway determined that neither resulted in any remaining market value for the Building. KMA validated Sedway's analysis and conclusions.

Finally, in their briefs on this appeal appellants offer their own attempted analysis of the Emporium Building's market value in an effort to prove that the Building retains some value after deducting the projected costs of rehabilitation and refurbishment. Their suggested approach is to subtract projected rehabilitation costs from the *appraised value* of the Emporium Building, *and the land on which it stands*, at some undisclosed point in time. There are numerous difficulties with this argument.

First, it is substantively faulty. The Downtown Plan asks only whether the Significant Building proposed for demolition, *not* the building and land together, has any remaining market value.

Second, assessed value is very different from market value. The former is figured as of some base year, and is then arbitrarily augmented each year by a given percentage of the prior year's assessed value. (Rev. & Tax. Code, § 51.) Over time, assessed value and market value may diverge substantially, depending on market fluctuations and the depreciation of improvements to the property. Moreover, unlike fair market value, assessed value of a commercial building such as the Emporium Building does not have to make any assumptions as to whether the Building will be rehabilitated and preserved as opposed to demolished and replaced. Appellants' assertion that market value can be obtained simply by subtracting rehabilitation costs from assessed value has no foundation or support in the field of commercial real estate valuation. The relevant questions instead are: (1) what will it cost to turn an unoccupied, run-down commercial property into a revenue-generating income property; and (2) will the revenue projected to be generated from the rehabilitated property justify the required investment? These are the questions addressed by Sedway, KMA, the city architect, the Commission, and the Board in their respective determinations that no historic rehabilitation of the Emporium Building could generate a revenue stream sufficient to cover the cost of such rehabilitation. Because they do not care for this answer, appellants have simply chosen to avoid posing these questions.

Third, appellants give no explanation for their rehabilitation cost estimate of $77 million, which arbitrarily excludes approximately $53 million in various items of expense identified by both Sedway and KMA. These excluded items include such things as design costs, permits, insurance, property taxes, and costs of making tenant improvements. There is no explanation offered for these missing costs, the ignoring of which conveniently permits appellants to posit a rehabilitation expense less than their assumed "appraised value" of the Emporium Building and property.

Finally, and perhaps most importantly, appellants never presented their proposed analysis at any point during the multiyear preapproval administrative process below. They may therefore be said to have waived this argument altogether. ■ Exhaustion of administrative remedies is a *jurisdictional* prerequisite to a judicial action challenging any planning decision. (*Corona-Norco, supra*, 17 Cal.App.4th at p. 993.) If a party wishes to make a particular methodological challenge to a given study relied upon in planning decisions, the challenge must be raised in the course of the administrative proceedings. Otherwise, it cannot be raised in any subsequent judicial proceedings. (*Park Area Neighbors v. Town of Fairfax* (1994) 29 Cal.App.4th 1442, 1447-1449 [35 Cal.Rptr.2d 334] [failure to make timely methodological challenge constitutes waiver, barring such challenge on judicial review].)

Having failed to present their proposed methodology to the City during the course of the administrative review process, appellants cannot do so now for the first time on appeal.

We conclude that the administrative record contains substantial evidence supporting the City's finding that, as required by the Downtown Plan and General Plan, the Emporium Building retains no substantial remaining market value in its present configuration and condition. We consequently find no abuse of discretion in the City's balancing of the competing policies and objectives set out in the Downtown and General Plans as applied to this Project. The responsible City agencies reasonably determined the Project was consistent with the City's General and Downtown Plans, and did not abuse their discretion or act arbitrarily, capriciously, or without evidentiary basis in approving the Project. We must therefore affirm the decision of the trial court upholding the agency's determination in this respect. (*Sequoyah Hills, supra,* 23 Cal.App.4th at pp. 717-718; *A Local & Regional Monitor v. City of Los Angeles, supra,* 16 Cal.App.4th at p. 648; *Concerned Citizens of Calaveras County v. Board of Supervisors, supra,* 166 Cal.App.3d at p. 96.)

## COMPLIANCE WITH CEQA

Appellants' next contention is that the City's approval of the Project was in violation of CEQA because the EIR itself was inadequate and should not have been certified. Appellants base their assertion on three separate grounds: (1) the EIR's failure to include an analysis of the economic feasibility of the project alternatives; (2) the alleged existence of feasible alternatives to the Project as approved; and (3) the alleged insufficiency of the EIR's discussion of traffic and parking impacts and its failure to provide adequate mitigating measures therefor. None of these contentions has merit.

### Judicial Review Of EIR Certification

Through the enactment of CEQA, the Legislature sought to protect the environment with the establishment of administrative procedures drafted, among other things, to "[e]nsure that the long-term protection of the environment, consistent with the provision of a decent home and suitable living environment for every Californian, shall be the guiding criterion in public decisions." (Pub. Resources Code, § 21001, subd. (d);[13] *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66].) The "heart of CEQA" is the EIR, whose purpose is to inform the public and

---

[13]Unless otherwise indicated, all further statutory references are to the Public Resources Code.

government officials of the environmental consequences of decisions before they are made. (*Goleta Valley II, supra,* 52 Cal.3d at p. 564; *Laurel Heights I, supra,* 47 Cal.3d at p. 392; *Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1315 [8 Cal.Rptr.2d 473].) In general, an EIR must be prepared on any "project" a public agency intends to approve or carry out which "may have a significant effect on the environment."[14] (§§ 21082.2, subd. (a), 21100, 21151; Guidelines, § 15002, subd. (f); *Sierra Club v. County of Sonoma, supra,* 6 Cal.App.4th at p. 1315.)

CEQA defines the quantum of evidence constituting substantial evidence as follows: "Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly inaccurate or erroneous, or evidence of social or economic impacts which do not contribute to, or are not caused by, physical impacts on the environment, is not substantial evidence. Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (§ 21082.2, subd. (c).) In turn, the CEQA Guidelines set out in the California Code of Regulations define "substantial evidence" as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).)[15]

■ Judicial review under CEQA is generally limited to the question whether the public agency has abused its discretion by not proceeding as required by law, or by making a determination not supported by substantial evidence. (§§ 21168, 21168.5; *Sierra Club v. County of Sonoma, supra,* 6

---

[14]The term "project" is defined broadly to include any activity undertaken directly by or with the support of a public agency, or involving the issuance of a permit, license or other entitlement by a public agency, "which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment." (§ 21065; see also Cal. Code Regs., tit. 14, §§ 15002, subd. (d), 15378, subd. (a) (hereinafter Guidelines).) "The definition encompasses a wide spectrum, ranging from the adoption of a general plan, which is by its nature tentative and subject to change, to activities with a more immediate impact, such as the issuance of a conditional use permit for a site-specific development proposal. [Citations.]" (*Sierra Club v. County of Sonoma, supra,* 6 Cal.App.4th at p. 1315.)

[15]"(a) 'Substantial evidence' as used in these guidelines means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. Whether a fair argument can be made that the project may have a significant effect on the environment is to be determined by examining the whole record before the lead agency. Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment does not constitute substantial evidence. [¶] (b) Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (Guidelines, § 15384.)

Cal.App.4th at p. 1317.) In our review, we must be careful not to interpret the provisions of either CEQA or the Guidelines "in a manner which imposes procedural or substantive requirements beyond those explicitly stated" in CEQA and its Guidelines. (§ 21083.1)[16] Our role in applying this test is identical to that of the trial court. We must independently review the administrative record to determine whether it is free from legal error. Thus, the conclusions of the trial court, and its disposition of the issues in this case, are not conclusive on appeal. (*Quail Botanical Gardens Foundation, Inc. v. City of Encinitas* (1994) 29 Cal.App.4th 1597, 1602-1604 & fn. 3 [35 Cal.Rptr.2d 470]; *Sierra Club v. County of Sonoma, supra,* 6 Cal.App.4th at p. 1321; *Bowman v. City of Petaluma* (1986) 185 Cal.App.3d 1065, 1071, 1076 [230 Cal.Rptr. 413]; *Orinda Assn. v. Board of Supervisors* (1986) 182 Cal.App.3d 1145, 1160 [227 Cal.Rptr. 688].)

## Failure To Include Economic Feasibility Analysis

The EIR identified five hypothetical alternatives to the proposed Project, all of which to a greater or lesser degree involved fewer changes to the Emporium Site Redevelopment Area: Alternative A, no project; Alternative B, Reduced Development, the proposed Project minus any hotel tower; Alternative C, Conservative Preservation, preserving and rehabilitating the Emporium Building with new construction allowing for appropriate use of the historic building, and leaving Jessie Street intact; Alternative D, Modified Preservation, preserving more of the historic exterior and interior features of the Emporium Building than the proposed Project, but with more new construction and alterations to the Building than under the more conservative preservation alternative; and Alternative E, Existing Planning Controls, essentially another preservation alternative differing in certain details from the other two, and in full compliance with the City Planning Code and the General Plan. At some length, the EIR then discussed the different environmental impacts associated with these alternatives. Appellants' principal contention is that the EIR was defective because it failed to address the *economic feasibility* of the five alternatives as well.

Appellants' contention is without merit. As is self-evident from its name, an EIR is an *environmental* impact report. As such, it is an informational document, not one that must include ultimate determinations of economic feasibility. CEQA explicitly states that the purpose of an EIR is simply "to

---

[16]Section 21083.1 provides: "It is the intent of the Legislature that courts, consistent with generally accepted rules of statutory interpretation, shall not interpret this division or the state guidelines adopted pursuant to Section 21083 in a manner which imposes procedural or substantive requirements beyond those explicitly stated in this division or in the state guidelines."

*identify* the significant effects on the environment of a project, to *identify* alternatives to the project, and to *indicate* the manner in which those significant effects can be mitigated or avoided." (§ 21002.1, subd. (a), italics added.)[17] Thus, a listing of potential "[a]lternatives to the proposed project" is one of the mandatory elements to be included in an EIR. (§ 21100, subd. (b)(4).) CEQA also provides that the significant adverse effects on the environment identified in the EIR must be mitigated or avoided "whenever it is feasible to do so." (§ 21002.1, subd. (b).) However, nowhere does the statute mandate that the EIR *itself* also contain an analysis of the feasibility of the various project alternatives or mitigation measures that it identifies.

To the contrary, CEQA specifically provides that it is *the public agency*, not the EIR, that bears responsibility for making "findings" as to whether "[s]pecific economic, legal, social, technological, or other considerations . . . make infeasible the mitigation measures or alternatives identified in the [EIR]," or whether there are "specific overriding economic, legal, social, technological, or other benefits of the project" that "outweigh the significant effects on the environment." (§§ 21002.1, subds. (b), (c), 21081.)[18] Section 21081.5 in turn specifically provides that in making these determinations, "the public agency shall base its findings *on substantial evidence in the record.*" (§ 21081.5, italics added.) Thus, although CEQA plainly provides that a reasonable range of alternatives must be included in the EIR, the

---

[17]Section 21002.1 provides in pertinent part as follows: "[T]he Legislature hereby finds and declares that the following policy shall apply to the use of environmental impact reports prepared pursuant to this division:

"(a) The purpose of an environmental impact report is to identify the significant effects on the environment of a project, to identify alternatives to the project, and to indicate the manner in which those significant effects can be mitigated or avoided.

"(b) Each public agency shall mitigate or avoid the significant effects on the environment of projects that it carries out or approves whenever it is feasible to do so.

"(c) If economic, social, or other conditions make it infeasible to mitigate one or more significant effects on the environment of a project, the project may nonetheless be carried out or approved at the discretion of a public agency if the project is otherwise permissible under applicable laws and regulations."

[18]Section 21081 provides: "Pursuant to the policy stated in Sections 21002 and 21002.1, no public agency shall approve or carry out a project for which an environmental impact report has been certified which identifies one or more significant effects on the environment that would occur if the project is approved or carried out unless both of the following occur:

"(a) The public agency makes one or more of the following findings with respect to each significant effect:

"(1) Changes or alterations have been required in, or incorporated into, the project which mitigate or avoid the significant effects on the environment.

"(2) Those changes or alterations are within the responsibility and jurisdiction of another public agency and have been, or can and should be, adopted by that other agency.

"(3) Specific economic, legal, social, technological, or other considerations, including considerations for the provision of employment opportunities for highly trained workers,

statute does *not* require the EIR itself to provide any evidence of the feasibility of those alternatives, much less an economic or cost analysis of the various project alternatives and mitigating measures identified by the EIR. Instead, it *does* require the public *agency* to make findings and determinations as to the feasibility of such alternatives or mitigation measures with respect to each significant environmental impact which the EIR *identifies,* based on substantial evidence set forth anywhere "in the record." In short, there is no statutory basis in the language of CEQA for appellants' contention that the EIR in this case was inadequate and defective because it failed to assess the economic feasibility of the five alternatives which it identified and discussed. We decline appellants' invitation to interpret the explicit statutory language in the manner which they urge on this court, and thereby impose a new procedural and substantive requirement on the preparation of an EIR that is clearly beyond those already prescribed. (§ 21083.1)

The Guidelines even more explicitly support this interpretation. Section 15131, subdivision (c) of the Guidelines provides that "[e]conomic, social, and particularly housing factors shall be considered by public agencies together with technological and environmental factors in deciding whether changes in a project are feasible to reduce or avoid the significant effects on the environment identified in the EIR. *If information on these factors is not contained in the EIR, the information must be added to the record in some other manner to allow the agency to consider the factors in reaching a decision on the project.*" (Italics added.) Similarly, section 15131 of the Guidelines states that "[e]conomic or social information *may* be included in an EIR *or may be presented in whatever form the agency desires.*" (Italics added.)

This court has previously rejected the very argument advanced by appellants in this case. As stated in *Sequoyah Hills, supra,* 23 Cal.App.4th 704: "Appellant also appears to argue that the EIR did not adequately address the issue of economic feasibility of the alternatives to the proposed project. While economic information about a given project may be included in an EIR, it is not required. [Citation.] Although the ultimate decisionmaker is required to consider economic and social factors in making its feasibility findings, the agency may receive such information in whatever form it desires. [Citation.] If the decisionmaker is correct in finding that a given

make infeasible the mitigation measures or alternatives identified in the environmental impact report.

"(b) With respect to significant effects which were subject to a finding under paragraph (3) of subdivision (a), the public agency finds that specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment."

alternative is infeasible, the EIR will not be deemed inadequate simply because it failed to include an analysis of that alternative. [Citation.]" (*Id.* at p. 715, fn. 3; see also *Citizens of Goleta Valley v. Board of Supervisors* (1988) 197 Cal.App.3d 1167, 1180 [243 Cal.Rptr. 339] (*Goleta Valley I*) [court examined entire administrative record to determine if county's determination finding environmentally less damaging alternative infeasible was supported by substantial evidence].)

The cases cited and relied upon by appellants are not to the contrary. They concern the separate issue of a public agency's failure to identify a reasonable range of potentially feasible alternatives because the agency claimed to have already made the foundational determination that there were no feasible alternatives *before drafting the EIR.* (*Laurel Heights I, supra,* 47 Cal.3d at pp. 404-407; *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 731, 736 [270 Cal.Rptr. 650].) Neither case dealt with or had anything to say concerning the issue of whether the ultimate economic feasibility evidence relied upon by the agency in making its decision *after* certification of the EIR must be contained in the EIR or may instead be set forth elsewhere in the record.[19] In contrast, here the City did not consider and reject potentially feasible alternatives in a private internal process before drafting the EIR. Instead, the EIR identified five potentially feasible alternatives and then extensively analyzed their environmental impacts.

In sum, in this case the EIR satisfied CEQA's mandate to identify and discuss a reasonable range of potentially feasible alternatives and compare their environmental impacts with those of the proposed Project. The administrative record then provided ample evidence and analysis of the economic feasibility of these various alternatives as compared to the Project. This evidence and analysis was available to the City, its agencies and the public to evaluate before making the ultimate decision to certify the EIR and approve the Project. CEQA does not require more than this.

### Finding Of No Feasible Alternatives

Under CEQA, public agencies are required to consider measures to avoid or mitigate a project's identified adverse environmental impacts, and

---

[19]In fact, the court in *Kings County Farm Bureau* stated that the agency's obligations would be satisfied once the EIR contained a meaningful discussion of alternatives, and findings were made regarding the feasibility of those alternatives "on the record." (*Kings County Farm Bureau v. City of Hartford, supra,* 221 Cal.App.3d at p. 731.)

Appellants also cite two other cases in which a discussion of economic feasibility happened to be contained in an EIR, as permitted by the CEQA Guidelines. However, neither of these cases held that such feasibility analysis *must* be contained in the EIR. (*City of Fremont v. San Francisco Bay Area Rapid Transit Dist.* (1995) 34 Cal.App.4th 1780 [41 Cal.Rptr.2d 157]; *Foundation for San Francisco's Architectural Heritage v. City and County of San Francisco, supra,* 106 Cal.App.3d 893.)

adopt them if feasible. (§§ 21002, 21002.1, subds. (b), (c), 21081; *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 123 [65 Cal.Rptr.2d 580, 939 P.2d 1280].)[20] Appellants argue that, contrary to the conclusions of the Board, feasible alternatives to the Project do exist. In support of this argument, they cite case law stating that a finding of infeasibility requires not just a showing of greater costs or lost profits, but evidence that the negative financial impact of the alternative would be so severe as to render it "impractical to proceed" with it. (*Goleta Valley I, supra,* 197 Cal.App.3d at p. 1181.)[21] Insisting that the preservation alternatives identified in the EIR are not impractical, appellants contend that the City was therefore obligated to adopt one of these alternatives instead of the environmentally more damaging Project. Appellants are wrong. The administrative record contains ample substantial evidence to support the Board's finding that the preservation alternatives were infeasible.

As discussed, the EIR identified and discussed in detail five alternatives to the preferred Project. Sedway then prepared detailed economic analyses of each of these alternatives. KMA in turn reviewed the Sedway report, confirmed its calculations and figures, and concurred in its results. These results showed that in view of the huge costs involved, *any* development of the vacant and rapidly deteriorating Emporium Building and the dilapidated and underutilized buildings along Mission Street would require a significant infusion of public money. The Sedway report calculated the development costs and projected revenue stream for the preferred Project and each preservation alternative in order to determine the return an investor could expect to make and the consequent amount a prudent person might invest given the expected revenue stream. The financial gap between the amount a prudent person would invest on a given project and the required rehabilitation and development costs represented a shortfall that would have to be made up with public investment. The less revenue generated by the selected

---

[20]Section 21002 provides: "The Legislature finds and declares that it is the policy of the state that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects, and the procedures required by this division are intended to assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives of feasible mitigation measures which will avoid or substantially lessen such significant effects. The Legislature further finds and declares that in the event specific economic, social, or other conditions make infeasible such project alternatives or such mitigation measures, individual projects may be approved in spite of one or more significant effects thereof."

[21]"The fact that an alternative may be more expensive or less profitable is not sufficient to show that the alternative is financially infeasible. What is required is evidence that the additional costs or lost profitability are sufficiently severe as to render it impractical to proceed with the project." (*Goleta Valley I, supra,* 197 Cal.App.3d at p. 1181.)

alternative, the more public assistance required. Absent such public participation, no prudent person would proceed with any project, and the Emporium Site Redevelopment Area would remain undeveloped.

Sedway's analysis of the various alternatives showed that the more historic preservation required, the higher the costs of rehabilitation and development, and the lower the projected income stream and profitability of the final product. The three preservation alternatives would all have significantly less square footage of commercial space than the proposed Project, with consequent reductions in the amount of commercial income and profit, tax revenues, and job opportunities for the community. These reductions in projected revenue stream necessarily decreased the amount of investment any prudent investor would make, and increased the financial gap between private investment sources and development costs that would have to be filled by public participation and funding.

Thus, Sedway's analysis concluded that Alternative C, the most preservation-oriented option, would require an estimated $82.1 million in public investment to close the financial shortfall between private investment and cost of rehabilitation and development. Alternative D, the modified preservation alternative with less of the original architectural elements of the Emporium preserved and more modern construction, would still require an estimated $59.5 million in public participation. Alternative E, the so-called "Existing Planning Controls" option, would require public funding in the amount of an estimated $78.3 million. In contrast, the Project approved by the City required only $27 million in public participation, and was the only alternative for which the entire public investment could be covered by the City's portion of the increased tax revenues generated by the Project itself.[22] KMA concurred with Sedway's report. It found independently that "the EIR alternatives are not financially feasible without public assistance and that the assistance is minimized by the Preferred Alternative [the Project]."

Significantly, appellants do not identify which of the several preservation alternatives would be feasible. Nor do they point to any evidence in the

---

[22]The least expensive alternative, not considered at all, would be to demolish the Building and develop the property from scratch. Alternative A, the "No Project" alternative, would obviously not involve any investment, public or private. However, it would leave the subject area essentially abandoned, and generate none of the economic redevelopment needed in the area. Alternative B, the "Reduced Development" alternative, essentially is the preferred Project minus a hotel tower; it is not a preservation alternative at all, and for this reason presumably uninteresting to appellants. In any event, it would generate significantly less commercial and tax revenue than the preferred Project because of the absence of the hotel, and would consequently require more public investment.

record to contradict the strong evidence of infeasibility.[23] They simply argue that *some* preservation alternative with less adverse environmental impact than the preferred Project should have been adopted. Contrary to appellants' apparent assumption, CEQA does not require that an agency select the alternative course most protective of the environmental status quo. (*Laurel Heights I, supra,* 47 Cal.3d at p. 393 [" 'CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations' "]); *Foundation for San Francisco's Architectural Heritage v. City and County of San Francisco, supra,* 106 Cal.App.3d at p. 913 ["The statute, however, does not require the Board to reach a conclusion in favor of environmental values in each instance"].) CEQA's only purpose is to guarantee that the public and the agencies of the government will be *informed* of environmental impacts, that they will *consider* those impacts before acting, and that insofar as practically possible, *feasible* alternatives and mitigation measures will be adopted to lessen or avoid adverse environmental impacts.

The record shows these purposes of CEQA were met in this case. The City and its agencies made every effort to mitigate the environmental impacts of the Project as much as possible, requiring numerous changes and amendments that ultimately resulted in a proposal that preserves the most significant architectural and historic elements of the Emporium Building while revitalizing a major downtown area at a cost the City could afford. We conclude that there was substantial evidence in the administrative record to support the decision of the Board finding that the proposed preservation alternatives to the Project were infeasible, in that the additional costs and lost profitability they would entail were sufficiently severe as to render them impractical. (*Goleta Valley I, supra,* 197 Cal.App.3d at p. 1181.) Neither the City nor any of the responsible agencies abused their discretion in approving the Project as the only alternative proposed that was feasible and practical.

### Adequacy Of Discussion Of Parking Impacts And Mitigation

Appellants' final challenge to the adequacy of the EIR focuses on mitigation of traffic and parking impacts. They contend that the EIR shows the Project will have significant impacts in the form of increased gridlock

---

[23]The only "evidence" cited by appellants consists of a claim by one lay witness that Sedway underestimated the current market value of commercial rent per square foot, and opinion statements by another such witness that some tenant other than Bloomingdale's could be found for a rehabilitated and preserved Emporium Building. Aside from the speculative and conjectural nature of this purported evidence, the City was not required to disregard the extensive contrary expert opinion evidence in the record in making its decision on the feasibility of project alternatives. (*Laurel Heights I, supra,* 47 Cal.3d at p. 393.)

and traffic pressure and the demand for at least 1,250 new parking spaces, yet fails to identify or propose any mitigating measures for these impacts. On this basis, appellants argue the City's certification of the EIR must be overturned, and the matter remanded with orders that the EIR be supplemented to include analysis of the environmental impacts caused by increased traffic and demand for parking.

The EIR discussed potential traffic impacts and parking shortfalls in detail, considering existing conditions, cumulative development conditions in 2015, and projected interim conditions in 2003. It concluded the Project would result in immediate impacts on traffic congestion at two intersections in the vicinity, and cumulative impacts over time in the SOMA area. In addition, it concluded that the parking demand generated by the Project would result in 95 percent occupancy of available spaces in the vicinity generally, and 100 percent occupancy during peak holiday periods and major events at the neighboring Moscone Convention Center. By 2015, the parking demand in the Project area would exceed capacity due to cumulative development.

 With regard to the discussion of mitigation measures, an EIR need not be exhaustive or perfect; it is simply required to "describe feasible measures which could minimize significant adverse impacts." (Guidelines, § 15126.4, subd. (a)(1); Pub. Resources Code, § 21100, subd. (b)(3).) We review the EIR's discussion of mitigation measures by the traditional substantial evidence standard. It is not our task to determine whether adverse effects could be better mitigated. (*Laurel Heights I, supra,* 47 Cal.3d at pp. 392-393; *Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 843 [29 Cal.Rptr.2d 492].)

 Here, the EIR identified specific mitigation measures to reduce the significant traffic impacts of the Project, including adjustment of traffic signal timing, alteration of traffic lines at intersections expected to experience traffic congestion impacts, and development and implementation of public transit incentive programs for Project employees and patrons. The EIR concluded the mitigation measures identified would significantly reduce the adverse traffic impacts. The EIR's analysis of traffic impacts and identification of mitigating measures was clearly sufficient and supported by substantial evidence. (See *Save Our Peninsula, supra,* 87 Cal.App.4th at pp. 137-139.)

With regard to adverse impacts on parking availability, the EIR noted that the Project site is located at a transit hub served by BART, 25 MUNI bus lines, five MUNI metro lines, cable car lines, Golden Gate Transit, AC

Transit, Caltrain and SamTrans; and it specifically pointed out that providing additional off-street parking would result in the adverse environmental impact of attracting more cars to the area, in conflict with the City's charter policy to encourage the use of public transit first and discourage the use of private automobiles in areas "well served by public transit." (S.F. Charter, § 16.102(7).) To mitigate the secondary *environmental* impacts of increased demand for parking, the EIR suggested reducing the number of monthly spaces rented at the neighboring City public parking garage at Fifth and Mission Streets to increase the number of available short-term spaces; proposed various traffic-related measures to mitigate increased congestion; and noted that City agencies were concurrently undertaking feasibility studies for the expansion of the Fifth and Mission garage.

Contrary to appellants' apparent assumption, there is no statutory or case authority requiring an EIR to identify specific measures to provide additional parking spaces in order to meet an anticipated shortfall in parking availability. The social inconvenience of having to hunt for scarce parking spaces is not an environmental impact; the secondary effect of scarce parking on traffic and air quality *is*. Under CEQA, a project's social impacts need not be treated as significant impacts on the environment. An EIR need only address the *secondary physical* impacts that could be triggered by a social impact. (Guidelines, § 15131, subd. (a).)

Thus, the EIR correctly concluded that "[p]arking shortfalls relative to demand are not considered significant environmental impacts in the urban context of San Francisco. Parking deficits are an inconvenience to drivers, but not a significant *physical* impact *on the environment*." (Italics added.) The EIR then fulfilled its CEQA-mandated purpose by identifying ways in which the secondary *environmental* impacts *resulting from* the projected parking deficits could be mitigated, in keeping with the specific environmental strictures imposed by the City's own transit-first policy. It is not our place to reweigh the evidence or impose our opinion that the identified adverse effects could be better mitigated than as suggested in the EIR. (*Laurel Heights I, supra,* 47 Cal.3d at pp. 392-393; *Save Our Peninsula, supra,* 87 Cal.App.4th at pp. 137-139; *Sequoyah Hills, supra,* 23 Cal.App.4th at p. 717.) The EIR in this case was sufficient as a matter of law. (*Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1019 [280 Cal.Rptr. 478] [EIR found adequate because it set forth measures to reduce

the secondary *environmental* effects caused by the need for additional parking].)[24]

## SUFFICIENCY OF EVIDENCE OF BLIGHT UNDER REDEVELOPMENT LAW

Appellants concede that their contentions about the Project's arguable lack of compliance with the City Planning Code are not actionable because the Project was incorporated into the Yerba Buena Center Redevelopment Plan, putting it under the jurisdiction of the Agency rather than the City. However, they contend the Project is *not* properly part of such a redevelopment plan, because the Emporium Site Redevelopment Area allegedly does not qualify as a "blighted area" under the Community Redevelopment Law. Appellants are wrong; the administrative record is replete with substantial evidence supporting the conclusion that the Emporium Site Redevelopment Area is blighted as a matter of law.

### The Community Redevelopment Law

Under the Community Redevelopment Law, redevelopment agencies have the power to systematically revitalize urban areas that have deteriorated to the point that private investment alone can no longer succeed, even with ordinary government assistance. (Health & Saf. Code, §§ 33037, 33131.) Before designating a redevelopment area, the local legislative authority must make a determination that the area proposed for redevelopment satisfies the statutory definition of "blight." (Health & Saf. Code, § 33367, subd. (d)(1).) To be found blighted, an area must satisfy four criteria. (*Friends of Mammoth, supra,* 82 Cal.App.4th at pp. 538-539; *County of Riverside v. City of Murrieta* (1998) 65 Cal.App.4th 616, 620, 624-625 [76 Cal.Rptr.2d 606].) It must be (1) "predominantly urbanized" (Health & Saf. Code, § 33030, subd. (b)(1)); (2) characterized by one or more statutorily defined conditions of

---

[24]Significantly, the City Planning Code itself does not require new commercial projects in the downtown commercial retail district to provide additional off-street parking. Thus, Planning Code section 161 states in pertinent part as follows: "(c) In recognition of the compact and congested nature of the downtown area . . . , the accessibility of this area by public transit, and programs for provision of public parking facilities on an organized basis at specific locations, no off-street parking shall be required for any use, other than dwellings where a requirement is specified, in any C-3 . . . . Commercial Districts."

We also note that the City required the developer, Foster City, to pay $1.5 million for the development of parking solutions in the SOMA area, and at least $1.25 million more for improvements to the BART/MUNI station at Powell Street and other improvements to help facilitate use of public transit. Although not termed as such by the EIR, this nearly $3 million in funds to alleviate the traffic and parking impacts of the Project constitutes a significant mitigation measure in and of itself. (Cf. *Save Our Peninsula, supra,* 87 Cal.App.4th at pp. 139-142 [upholding EIR calling for developer payments to government fund as mitigation measure for traffic impacts].)

*physical* blight (Health & Saf. Code, § 33030, subd. (b)(2)(A)); (3) characterized by one or more statutorily defined conditions of *economic* blight (Health & Saf. Code, § 33030, subd. (b)(2)(B)); and (4) affected by a cumulative effect of physical and economic blight "so prevalent and so substantial that it causes a reduction of or a lack of, proper utilization of the area to such an extent that it constitutes a serious physical and economic burden on the community which cannot be reasonably expected to be reversed or alleviated by private enterprise or government action, or both, without redevelopment." (Health & Saf. Code, § 33030, subd. (b)(1).)

Among the *physical* conditions of blight specified by the controlling statute are "[b]uildings in which it is unsafe or unhealthy for persons to live or work" because of building code violations, dilapidation, deterioration, faulty or inadequate utilities or similar factors; and "[f]actors that prevent or substantially hinder the economically viable use or capacity of buildings or lots," based on elements such as substandard, obsolete or defective design, awkward floorplan or inadequate size given present standards and market conditions. (Health & Saf. Code, § 33031, subd. (a)(1), (2).) Statutorily defined *economic* conditions of blight include "[d]epreciated or stagnant property values or impaired investments," "[a]bnormally high business vacancies," and "[a] high crime rate that constitutes a serious threat to the public safety and welfare." (*Id.*, § 33031, subd. (b)(1), (2), (5).) Significantly, "[a] project area need not be restricted to buildings, improvements, or lands which are detrimental or inimical to the public health, safety, or welfare, but may consist of an area in which such conditions predominate and injuriously affect the entire area. A project area may include lands, buildings, or improvements which are not detrimental to the public health, safety or welfare, but whose inclusion is found necessary for the effective redevelopment of the area of which they are a part." (*Id.*, § 33321.)

On appellate review of a decision validating a redevelopment plan under the Community Redevelopment Law our role is a limited one. It is not the appellate court's place to reweigh the evidence or exercise its own independent judgment. We must instead confine ourselves to determining whether the findings and determinations of the responsible agencies are supported by substantial evidence in the administrative record. (*In re Redevelopment Plan for Bunker Hill* (1964) 61 Cal.2d 21, 38-41 [37 Cal.Rptr. 74, 389 P.2d 538] ["the trial court was correct in its refusal to reweigh the evidence and in confining itself to determining whether the findings and determinations of the inferior bodies [regarding blight] were supported by substantial evidence"]; *Friends of Mammoth, supra,* 82 Cal.App.4th at p. 538 [standard of review on appeal of decision validating redevelopment plan is

"substantial evidence in the administrative record demonstrating the existence of specific characteristics of urbanization and blight"]; *Beach-Courchesne v. City of Diamond Bar* (2000) 80 Cal.App.4th 388, 394 [95 Cal.Rptr.2d 265] [same] *(Beach-Courchesne)*; *Morgan, supra,* 231 Cal.App.3d at p. 257 [" 'The substantial evidence standard, not the independent exercise of the court's judgment, governs judicial review of the findings and determinations of an agency and legislative body in the adoption and approval of a redevelopment plan' [citation]"].)

## Substantial Evidence Of Blight Exists

 As seen, the record need only establish one condition each of physical and economic blight. (Health & Saf. Code, § 33030, subd. (b)(2)(A).) The record in this case contains sufficient substantial evidence of both physical and economic blight to support the City's finding that the Emporium Building and its ancillary structures met the qualifications for inclusion in a redevelopment area under the applicable statutory definitions of the Community Redevelopment Law.[25]

### *Evidence On Existing Conditions In The Administrative Record*

The Agency's Existing Conditions Survey Report (Survey Report) was prepared by licensed civil engineers John B. Dykstra & Associates and Artek Consulting Engineers. This Survey Report carefully analyzed each of the 12 individual buildings in the Project area, exhaustively documenting its particular physical and structural deficiencies and specific adverse conditions. Adverse physical conditions considered "major" include general dilapidation or very serious deterioration of major parts of the structure; abandonment and vandalization; structural failure such as cracked or subsided foundations and sagging walls or roofs; and structural weakness, such as inadequate foundations, substandard construction, or unreinforced masonry walls. Based on its survey and analysis of the conditions, the Agency then rated each building in the Project area on a scale of 1 to 5, with the highest rating awarded buildings in "[g]eneral excellent condition" and with no rehabilitation required; and the lowest rating assigned to buildings with "[v]ery extensive physical/structural deficiencies," a "[v]ery high" likely cost of correcting such deficiencies, and a potential for private economic rehabilitation rated as "[v]ery difficult, if not impossible."

Based on the Agency's field surveys and archival research, the Survey Report rated nine of the 12 buildings in the Emporium Site Redevelopment

---

[25]There is no dispute that the Emporium Site Redevelopment Area is "predominantly urbanized," and thus fulfills the first essential requirement for inclusion in a redevelopment area. (Health & Saf. Code, § 33030, subd. (b)(1).)

Area as category 1 or 2, with very extensive or extensive physical and structural deficiencies, very high or high costs to correct them, and low potential for private rehabilitation. Specifically, the Survey Report assigned the Emporium Building a rating of 2, "[e]xtensive physical/structural deficiencies," based on the presence of adverse physical conditions and significant cumulative deferred maintenance, manifested in cracked walls, decayed and leaking roofing materials, aging electrical and plumbing systems, and extensive water damage to ceilings and walls. The report also pointed out that the Emporium Building has unreinforced masonry walls dating from 1896, as well as unreinforced masonry columns between the fourth floor and the top of the seven-story office building on the facade, with the result the Building was likely to suffer serious damage or even collapse in a future severe earthquake. It would also be difficult to adapt the Building to modern retail use because of its inefficient configuration, different levels, and haphazard connections with its adjoining annexes, which in many cases resulted in forklifts being required to move goods and materials from one part of the Emporium complex to another. In addition, the report noted that the Emporium Building has substandard heating and ventilation, with no heat or fresh air provided to much of the Building and no air conditioning system at all. The Building is now completely vacant, and has been largely unoccupied since 1996.

Of the 11 other buildings in the Project area, most are derelict, vacant and abandoned. Six of these buildings were given the same low rating of 2 as was given to the Emporium Building itself, and two more buildings were given the lowest possible rating of 1. Only three buildings were given higher ratings. Two buildings were rated 3. Only the Milwaukee Furniture Building at 832 Mission Street, the one building which had been retrofitted and was still occupied by operating commercial enterprises, was given a rating of 4. The average building condition rating for the entire Emporium Site Redevelopment Area is 2.2.

*Substantial Evidence Of Physical Blight*

The exhaustive analyses contained in the existing conditions Survey Report, the EIR, and the Agency's report to the Board provide substantial evidence to satisfy the finding of *physical* blight. All but one of the major buildings in the Emporium Site Redevelopment Area were built in or before 1955. The record shows that nine of the 12 buildings under consideration—75 percent—are in a seriously deteriorated condition, with significant physical deficiencies that render them unsafe and unhealthy for occupancy by workers and the public. At least eight of the 12 buildings are susceptible

to collapse in the event of a moderate to strong earthquake. Four of these buildings are of unreinforced masonry construction that has not been retrofitted at all; two additional buildings have unreinforced masonry walls; and the roofs of the other two buildings are supported by the unreinforced masonry walls of adjoining structures. On the basis of their seismic condition alone, eight of the 12 buildings in the Emporium Site Redevelopment Area are particularly susceptible to extensive damage or collapse in an earthquake, and meet the first statutory criterion for physical blight, namely, of being "unsafe or unhealthy for persons to live or work." (Health & Saf. Code, § 33031, subd. (a)(1).) Substantial evidence of blight has been found where only 25 percent of the commercial structures in the proposed redevelopment area were built with unsafe unreinforced masonry. (*Morgan, supra,* 231 Cal.App.3d at pp. 255-256.)

In addition, deteriorated and obsolete design conditions of the existing buildings in the project area "prevent or substantially hinder" their "economically viable use," as indicated by the high incidence of vacant, abandoned, or underutilized buildings.[26] (Health & Saf. Code, § 33031, subd. (a)(2).) Like many commercial buildings built before the adoption in 1955 of the Uniform Building Code, the buildings in the Emporium Site Redevelopment Area have substandard foundations, poorly reinforced walls, inadequate connections between buildings and foundations, weak cripple walls, inadequate roof and floor membranes, and substandard construction. Almost all the buildings have poorly configured floor plans, haphazard arrangements of space; long narrow spaces with windowless sidewalls, missing or inadequate heating systems, missing or substandard restroom facilities, and potentially toxic or hazardous building construction materials. Three buildings in the Project area are obsolete one-story industrial warehouse buildings with no prospect for viable commercial use in this dense commercial downtown area. In addition, two lots in the area have access only on Jessie Street, a poorly maintained and narrow service alley between Market and Mission Streets. Their location, coupled with their small size, makes them virtually unusable for any profitable commercial use in today's market.

In part because of the abandoned and decrepit nature of the buildings in the area, various portions—particularly along Jessie Street—suffer from the blight of virtual skid row conditions, with homeless encampments, trash, detritus and human excreta. The presence of these obvious symptoms of blight detracts considerably from the commercial viability of the Emporium Site Redevelopment Area in its current state.

---

[26]Over 99 percent of the building square footage in the Emporium Site Redevelopment Area is currently unoccupied or abandoned.

*Substantial Evidence Of Economic Blight*

 The evidence in the administrative record is also replete with evidence of *economic* blight. Aside from the physical deterioration, functional obsolescence and prohibitive expense making it infeasible to adapt the existing Emporium Building to modern commercial use, economic blight is evidenced by the precipitous decline in sales at the Emporium department store throughout the 1990's and the Emporium's ultimate bankruptcy and closure in 1996. Given the age and condition of the Emporium Building and its neighboring annexes, Federated was simply unable to formulate a financially feasible plan to restore and reuse the existing buildings. Significantly, the assessed value of the Federated properties at issue was reduced by $50 million from the upward reassessment that occurred at the time of the Emporium's change of ownership following the bankruptcy between 1991 and 1993. This reduction in assessed value is indisputable and powerful evidence of "[d]epreciated or stagnant property values or impaired investments," one of the definitions of conditions that cause economic blight under the controlling statute. (Health & Saf. Code, § 33031, subd. (b)(1).)

As the existing conditions survey report shows, the rest of the Project area consists of dilapidated, derelict, vacant and/or underutilized buildings. Like the Emporium Building, most of these buildings are economically obsolete because their physical plan is inappropriate for modern commercial or retail use. Even if commercially viable, they would in any event require large rehabilitation expenditures to make them usable. All these are indisputable evidence of two of the statutory criteria of economic blight, namely "[d]epreciated or stagnant property values or impaired investments," and "[a]bnormally high business vacancies." (Health & Saf. Code, § 33031, subd. (b)(1), (2).) Although the abnormally high vacancy rate alone would be sufficient to support the City's finding of economic blight, the record also shows that there is an elevated crime rate in the area, a factor independently establishing economic blight under the statutory definition. (*Id.* § 33031, subd. (b)(5).)

*Substantial Evidence Of Burden On Community Requiring Redevelopment*

 Finally, and in addition to the findings of physical and economic blight, an additional finding must be made that the blighted condition of the subject area is such that "it constitutes a serious physical and economic burden on the community" which cannot reasonably be expected to be alleviated or reversed without redevelopment. (Health & Saf. Code, § 33030, subd. (b)(1).) The evidence in this record shows that, without a substantial

infusion of public assistance, planning, tax incentives and investment, the private market simply cannot be expected to revitalize the Emporium Site Redevelopment Area. As seen, there is a massive financial gap between—on the one hand—the extraordinarily high costs of preparing the site, rehabilitating and preserving the most historically and architecturally significant portions of the Emporium Building, providing the necessary infrastructure for the large-scale project and making transit and circulation improvements in the area, and—on the other hand—the feasible amount of investment which could reasonably be expected from private sources. This feasibility gap can only be filled with government assistance. The overwhelming evidence of this fact, found in the Sedway report and independently verified by the City's expert KMA and the City Architect, readily satisfies the Community Redevelopment Law's definition of blight for purposes of validating the inclusion of the subject Project in the Emporium Site Redevelopment Area.

### Appellants' Contentions

Pleading that "space constraints do not permit detailed review" of the Survey Report or the other evidence of blight in the Project area, appellants do not cite *any* evidence in the record to contradict the finding of blight. Instead, in conclusory fashion, they simply recite their own lay opinions that none of the evidence of blight in the record satisfies the Community Redevelopment Law or appellate court analyses in cases on which they rely. Appellants' analysis of the record is insufficient as a matter of law, and the cases on which they rely are readily distinguishable on their facts.

Appellants cannot simply declare the record too large and complicated for them to analyze on this appeal. The tenor of appellants' argument is well exemplified by this statement in their opening brief: "While the *sum of evidence* in the Existing Building Survey and the [Sedway] Report to the Board note deferred maintenance and *some* significant problems in a *few* of the buildings, there is *no evidence* that *many* of the primary buildings could not be rehabilitated with a *willing owner*." (Italics added.) This statement, typical of appellants' "arguments," begs not just one, but a multitude of questions. What *is* the evidence—in the existing conditions survey report, the Sedway report, the draft, supplemental and final EIR's, the final report to the Board, and the rest of the administrative record—on blight? Appellants do not say; they instead ask us to read the 55-volume, 20,971-page record to see for ourselves. What *are* the "significant problems" noted in the Project area? Again, appellants do not address these problems at all; they simply dismiss them. What are the "few" buildings with "problems," and which are

the "many" buildings that might be rehabilitated "with a willing owner"? Appellants are silent on these questions. Most important, who is this "willing owner," and from where is she or he supposed to appear? Appellants do not identify *any* source willing or able to provide the substantial level of private and/or public investment and expenditure necessary to preserve the existing Emporium Building and simultaneously realize the successful redevelopment of the decayed and abandoned buildings in the Project area.

If in fact there were no evidence in the record to support the findings of blight, appellants' approach might be appropriate. The difficulty for appellants is that, as seen, there *is* such evidence in the record, and it is substantial. (Cf. *Friends of Mammoth, supra,* 82 Cal.App.4th at pp. 540-560; *Beach-Courchesne, supra,* 80 Cal.App.4th at pp. 396-404.) ▮ At any rate, "a redevelopment plan may not be overturned on the basis of a speculative argument regarding possible private investment in the area at some future time [citation]." (*National City Business Assn. v. City of National City* (1983) 146 Cal.App.3d 1060, 1068 [194 Cal.Rptr. 707].)

Rather than addressing the actual evidence in the record, appellants focus almost all their argument on the facts of other cases, blithely asserting that the Survey Report and other analyses in the record "do not satisfy" the rulings in those cases. However, the cases on which appellants rely are clearly distinguishable from this one.

In *Friends of Mammoth*, the case most heavily cited and relied upon by appellants, the redevelopment agency of the Town of Mammoth Lakes designated at least 1,100 acres of largely semirural land with low-intensity development as "predominantly urbanized" and "blighted." The redevelopment area included an airport, a golf course, a site designated for development of a community college, an industrial park, three partially developed recreation areas, all of downtown Mammoth Lakes, and a residential area of some 1,200 units, half of them condominiums. (*Friends of Mammoth, supra,* 82 Cal.App.4th at pp. 521-522.) The town claimed "blight" based on findings that less than 2 percent of the buildings in the project area suffered building code violations; 324 buildings, or approximately 25 percent of the total number of buildings in the project area, exhibited " 'visible and obvious signs of dilapidation or deterioration,' " defined *by the town* to include peeling paint, dry rot, and lack of maintenance; 273 buildings, or 21 percent of the total surveyed, suffered from "defective design" causing them to be nonfunctional or obsolete under current market conditions; 199 buildings, or 15 percent of the buildings surveyed, required seismic upgrading to meet

seismic building code standards adopted in 1994; and various properties in the project area suffered from "inadequate lot sizes," "substandard site design," or "inadequate site improvement." (*Id.* at pp. 538-560.) In reviewing the record, the court of appeal had no difficulty determining that, contrary to the town's findings, the mere fact that 85 percent of this huge project area was "not vacant" did not render it predominantly urbanized as required by the Community Redevelopment Law. With regard to the portions of this area that were developed, the appellate court concluded that the criteria utilized by the local agency for "physical blight" failed to establish that any of the buildings and structures on the land proposed for redevelopment were unsafe or unhealthy for persons to live or work in, or were so substandard as to prevent or substantially hinder their economically viable use. (*Ibid.*)

*Friends of Mammoth* is clearly distinguishable from the instant case. The Emporium Site Redevelopment Area is 4.5 acres, not 1,100 acres. In contrast to the 15 percent of buildings that failed to comply with *current* seismic regulations in *Friend of Mammoth* eight of the 12 buildings in the Emporium Site Redevelopment Area are unreinforced masonry buildings that would almost certainly suffer serious damage in any future earthquake and could completely collapse in a major earthquake. Thus, this case involves a large proportion of buildings that *do* present an actual hazard to human health and safety; *Friends of Mammoth* involved a small proportion of modern buildings not in technical compliance with contemporary standards, with no showing whatsoever of the extent of any hazard to health and safety involved. Unlike the Town of Mammoth Lakes' perfunctory survey of over 1,000 buildings in the huge project area, in this case the City did an exhaustive and detailed analysis of *each* of the *12* buildings in the Emporium Site Redevelopment Area. Finally, unlike the detailed analysis in the Survey Report and the Agency's final report to the Board of how the identified conditions of physical blight hinder the economic viability of each of the buildings in the Emporium Site Redevelopment Area, there was *no* analysis of how the overbroad findings of physical blight would prevent or substantially hinder the economic viability of the buildings in that project area. (*Friends of Mammoth, supra,* 82 Cal.App.4th at pp. 548-554.)

The case of *Beach-Courchesne, supra,* 80 Cal.App.4th 388, presents an even more egregious misuse of the Community Redevelopment Law by a municipality. In that case, the City of Diamond Bar, an affluent Los Angeles suburb, attempted to designate a huge 1,300-acre redevelopment area to encourage new retail development and increase its sales tax base. (*Id.* at pp.

392-393.) The evidence of physical blight was limited to a survey indicating that some 53 percent of the buildings in the survey area suffered from deferred maintenance, 8 percent required moderate rehabilitation, and only a single building was in need of extensive rehabilitation. Not one structure in the entire proposed redevelopment area was identified as being unsafe or unhealthy for persons to live or work in. Although some 27 percent of the buildings were said to exhibit one or more conditions of "defective design," there was no explanation as to how this alleged design defect hindered their economically viable use. (*Id.* at pp. 398-401.) Clearly, *Beach-Courchesne* is entirely distinguishable and inapposite to the case before us.

### Contentions Of Amici Curiae

In their letter brief, amici curiae (Amici) focus primarily on the Emporium Building itself, contending that whatever the blighted conditions of the rest of the study area, that historic structure cannot be said to satisfy the statutory conditions of blight. Their arguments miss the mark.

In the first place, Amici erroneously and improperly rely on matters outside the administrative record, including their own studies and materials, as well as speculative assumptions about the rehabilitative history of other buildings in the downtown area. None of these materials or speculations is relevant, or may be considered by this court at this point of the case. (*Western States, supra,* 9 Cal.4th at pp. 571-572 [review is confined to matters in the administrative record].) If amici had wished to include this evidence in the record, they should have done so during the lengthy administrative process. They did not then, and it is too late to do so now.

Like appellants, Amici also ignore the existing administrative record. Thus, they dismiss the undisputed fact that the Emporium Building has unreinforced masonry walls and similarly unreinforced supporting columns in most of the upper portions of the Building, all subject to collapse in a serious earthquake. They also ignore the fact that the walls and ceilings throughout the Building are cracked, deteriorating, and suffering from substantial water damage; the plumbing and electrical utilities are antiquated; and the Building's closely spaced columns, low floor-to-ceiling height and haphazard arrangement of space renders it functionally obsolete for modern commercial purposes. Contrary to the presumption of both Amici and appellants, the fact that the Project envisions rehabilitating and preserving the Emporium Building's facade does not mean it is economically feasible to restore the *entire Building* to historical preservation standards. Finally, like appellants, Amici apparently assume the Emporium Building could be rehabilitated with private investment alone, or with only modest public assistance. Once again, they ignore the substantial evidence in the record that only

with substantial public intervention and financial participation can the Emporium Building, together with its several adjunct buildings and annexes, be rehabilitated and put to viable economic use.

## CONCLUSION

In the final analysis, the legal issues presented by appellants and amici in this case mask the actual grievance underlying their arguments. Their real objections lie not with the sufficiency of the EIR as an information document, or even with the technical compliance of the proposed Project with the City's General Plan and the Community Redevelopment Law. Rather, appellants' and Amici's real grievance is with the substantive policy choices made by the City in seeking to alleviate the clearly blighted condition of this central and vital portion of downtown San Francisco by using the financial and institutional resources made available by the Community Redevelopment Law, even though to do so must permanently alter a portion of an important and prominent building of great historical and architectural significance to San Francisco.

We are not unmindful of the important environmental and historical preservation values at stake in this case. As the EIR itself acknowledges, the Emporium Building is one of the most historically and architecturally significant commercial buildings in San Francisco. In a perfect world, the Building could be preserved and put to some vibrant new use which would return it to life and fulfill its potential. Even under the best conditions and · the most flourishing economies, however, it is difficult to find willing developers for an outsized, aging, abandoned retail department store which is in desperate need of expensive rehabilitation and upgrading. In the contemporary commercial world in which we live, altruistic investors with a penchant for large-scale historic preservation and unlimited means to accomplish it are exceedingly rare. It must not be forgotten that a significant portion of the Emporium Building will be preserved, restored and rehabilitated in the new structure. Under the circumstances, the proposed Project represents perhaps the best compromise that can be hoped for from a preservationist standpoint—a fitting balance between the demands of the commercial marketplace and respect for the past.

In any event, review of the substantive policy decisions on how best to utilize the historic Emporium Building is clearly beyond our jurisdiction. (*Laurel Heights I, supra,* 47 Cal.3d at p. 392.) "Differences of opinion, no matter how strongly presented, do not warrant rejection of [public agencies'] action, where it has been demonstrated that [the agencies] were presented

with opposing viewpoints, considered them extensively and on the basis of evidence selected one alternative rather than another. [Citation.]" (*Morgan, supra,* 231 Cal.App.3d at p. 258.) In this case, the Agency, the City, and the trial court all found substantial evidence of blight within the Project area, concluded that the Emporium Building had no substantial remaining market value, and found that there were no feasible alternatives to the Project as proposed. We conclude that there is substantial evidence to sustain these determinations and findings, and that the actions and decisions of the City in certifying the EIR and approving the inclusion of the Project in an expanded redevelopment area were neither arbitrary or capricious. We therefore affirm the trial court's judgment denying the writ petition and request for invalidation.

## DISPOSITION

The judgment is affirmed. Each side shall bear its own costs on appeal.

Corrigan, J., and Parrilli, J., concurred.

A petition for a rehearing was denied October 28, 2002, and appellants' petition for review by the Supreme Court was denied December 18, 2002.