Filed 10/31/13 Ogawa v. City of Palo Alto CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JOY OGAWA, et al., | H037950 |
| Plaintiffs and Appellants, | (Santa Clara County Super. Ct. No. CV198482) |
| v. | |
| CITY OF PALO ALTO, et al., | |
| Defendants and Respondents. | |

Respondents City of Palo Alto (City) and its City Council proposed a "streetscape enhancement" project along a stretch of avenue in central Palo Alto. Appellants Joy Ogawa, Terry Shuchat, Jack Morton, and Antonio's Nuthouse, Inc. filed a petition for writ of mandate alleging violations of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) and other laws. The trial court, finding that City had violated CEQA, granted a peremptory writ of mandate and ordered City to take certain corrective actions. City complied with the court's order, filed a return to the writ, and moved to discharge the writ. Over appellants' objections, the trial court granted the motion to discharge the writ.

On appeal, appellants contend the trial court erred in discharging the writ, and that City failed to correct several CEQA violations not found by the trial court. We find appellants' arguments without merit and will affirm the order discharging the writ.

## I. FACTUAL AND PROCEDURAL BACKGROUND

A. *The Proposed Project*

The proposed project pertained to a four-block stretch of California Avenue bounded by El Camino Real to the west and a Caltrain station to the east (the Project). The Caltrain station and bus service along El

1

Camino Real serve as transit connections for many pedestrians and bicyclists. To facilitate travel between these two points, City planned certain "streetscape enhancements" transforming the avenue into a "community corridor with enhanced transit, bicycle, and pedestrian improvements." The enhancements included reducing the number of lanes on the avenue from four to two to promote a safer bicycle and pedestrian environment; community identity markers; traffic calming features, such as speed tables at crosswalks; bulb-outs at intersections to reduce crosswalk lengths; decorative pavement bands; outdoor seating areas; enhanced bicycle parking; information kiosks; newspaper racks; landscape improvements; enhanced and additional on-street parking; and redevelopment of the Caltrain plaza.

To solicit feedback from the community, City held a public meeting about the Project on March 16, 2010.[1] On April 14, 2010, City held a "Meeting with California Avenue Businesses" to solicit their views on the project. Appellants, including business owners on the avenue, expressed opposition to the lane reduction element of the Project on the basis that their customers would suffer reduced access by vehicle. Appellants also claimed City should have initiated CEQA review at that time. City held subsequent public meetings on September 9, September 23, and October 4, 2010. Additional "business community" meetings were held on September 8 and September 22, 2010. Appellants voiced their opposition to the Project throughout this period, directed most specifically at the lane reduction and the interference with customers and commercial activity potentially caused by the related construction.

On October 4, 2010, City filed a capital grant application with the Santa Clara Valley Transportation Authority (VTA) requesting funding for the Project in the amount of $1.175 million, with the City to provide $550,000 in matching funds. Later that month, City staff informed the City Planning and Transportation Commission that the grant would be funded pending City's passage of a VTA-required resolution as part of the application. City staff made conflicting statements to the Commission about whether acceptance of the grant funding would commit or "lock in" City to the planned reduction from four lanes to two lanes. The City's Chief Planning Official told the Commission that City would be locked in to lane reduction if it accepted the funds, but the Director of Planning stated that City could later reject the funds without committing to lane reduction.

---

[1] Appellants claim City first contemplated the Project in 2005. Appellants' citations to the record do not support this claim.

On December 6, 2010, City passed the required resolution authorizing City officials to execute and file an application for funding.  The resolution included a finding stating "that this resolution is not a project under the California Environmental Quality Act and, therefore, no environmental impact assessment is necessary."  The City Manager's report to City Council concerning the resolution stated, "CEQA analysis for the California Transit Hub Corridor project will be completed at a later date, if the funding approved [*sic*] and prior to Council approval of the project design."  VTA approved the grant application on December 9, 2010.

City had previously hired a traffic consultant to prepare a traffic study for the Project.  The consultant, focusing primarily on the impact of the proposed lane reduction, collected traffic data for about one month and completed the study on December 14, 2010.  The study concluded that the proposed lane reduction would have no significant adverse level-of-service impacts, and that no traffic diversion was expected to occur because the avenue would maintain sufficient capacity.  The study also concluded that the Project would enhance pedestrian circulation and bicycle safety.

In December 2010, City prepared a draft negative declaration with an initial study concluding that the Project would result in no significant environmental impacts.  A notice of intent to adopt a negative declaration stated that "the approval of a Negative Declaration does not constitute approval of the project under consideration.  The decision to approve or deny the project will be made separately."  The initial study and draft negative declaration were circulated for public review from December 17, 2010, to January 18, 2011.

On January 12, 2011, the Planning and Transportation Commission held a public hearing on the negative declaration.  The Commission recommended that City Council adopt the negative declaration and establish a "capital improvements program" to fund the Project.  As described by City, a capital improvements program is a financial planning tool used by local governments to provide a policy framework for the allocation of funding for projects such as street improvements.

On February 14, 2011, City Council held a public hearing on the Project.  Appellants and their counsel testified in opposition to the Project.  City Council, following the Commission's recommendation, approved the negative declaration and the creation of the capital improvements program to fund the $1.7 million cost of the Project.  On March 9, 2011, City filed with the county clerk a Notice of Determination

stating that City had approved the Project and the negative declaration without mitigation, and that the Project would have no significant effect on the environment.

B. *Appellants' Petition for a Writ of Mandate*

On April 8, 2011, appellants filed a petition for a writ of mandate and administrative mandamus against City and City Council. The petition set forth four causes of action: (1) alleged violations of CEQA, including inaccurate Project descriptions, improper segmentation of the Project, failure to consider the temporary impact of construction, inadequate mitigation, and improper deferral of mitigation; (2) alleged inconsistency with the general plan; (3) alleged violations of the Brown Act; and (4) a request for declaratory relief.

On November 9, 2011, following a hearing on the matter, the trial court issued an order granting the writ as to the first cause of action under CEQA. The trial court found that City Council's passage of the resolution on December 6, 2010—authorizing City to execute the application for VTA funding—had committed City to the proposed lane reduction. As such, the resolution constituted a "legislative action" by City, and an "approval" under CEQA Guidelines. (Cal. Code Regs., tit. 14, § 15352, subd. (a).) Because City approved the Project before it approved the negative declaration, the trial court found that the Project was approved without prior CEQA compliance. The trial court rejected the "self serving" language in the resolution stating that the grant application did not constitute a project for CEQA purposes. The court found no other CEQA violations.

The trial court denied relief under the remaining causes of action. The court found that City, as a charter city, was not required to make any finding that its approval of the capital improvements program was consistent with the general plan. Regarding the alleged violations of the Brown Act, the court found that City had complied with the Act's notice requirements by posting an agenda for the City Council's meeting of February 14, 2011. The trial court also noted that appellants were given ample opportunity to voice their concerns about the Project. The court denied the request for declaratory relief because the allegations solely concerned past wrongs, not prospective violations.

The trial court issued a judgment granting a peremptory writ of mandate on December 1, 2011. The order required City to: (1) declare void the December 6, 2010 resolution; (2) declare void the February 14,

4

2011 approvals of the negative declaration and capital improvements program financial planning tool; and (3) reconsider these decisions after appropriate CEQA review.

City complied with the writ. On November 21, 2011, City Council voted to declare void the December 6, 2010 resolution and the February 14, 2011 approvals of the negative declaration and capital improvements program financial planning tool. On November 28, one week later, City Council reconsidered and voted to reapprove the negative declaration. The negative declaration was identical in content to the previously approved declaration. City Council also adopted a new resolution authorizing an application for VTA funding and establishing a new capital improvements program to fund the project. City then filed a return to the writ citing the above actions as compliance with the writ. Appellants opposed the return to the writ, arguing that City had failed to comply with CEQA by: (1) failing to circulate the negative declaration for public review; (2) failing to give proper notice of its intent to adopt and make available for public review the negative declaration; and (3) improperly segmenting the Project.

City moved to discharge the writ on December 22, 2011. In support of the motion, City argued that it was only required to correct those CEQA violations found by the trial court. Since the court had only found one violation—the premature adoption of the December 6, 2010 resolution prior to CEQA review—City argued that it had corrected the violation by voiding the prior resolution and approvals, and re-adopting a new resolution *after* approving a negative declaration. City argued that appellants had previously raised issues of inadequate project description and segmentation in their initial petition but the court had not found any such violations. Finally, City argued that CEQA did not require it to change or recirculate the negative declaration prior to readopting it.

Appellants opposed the motion to discharge the writ. Appellants argued that City was required to correct CEQA violations not found by the trial court's order. Appellants further argued that City did not conduct the required CEQA review prior to readopting the resolution and reapproving the negative declaration. Finally, appellants again argued that City had failed to provide an opportunity for public review and improperly segmented the Project.

After hearing argument on the matter, the trial court granted City's motion to discharge the writ on February 3, 2012. Appellants now appeal from that order and the trial court's December 1, 2011 order granting the peremptory writ.

5

## II. DISCUSSION

Appellants raise six arguments on appeal, claiming that (1) the trial court erred in discharging the writ because City ignored CEQA requirements not found in the trial court's order of November 9, 2011; (2) the negative declaration does not adequately describe the Project; (3) City failed to comply with CEQA's notice requirements; (4) City improperly segmented the Project; (5) City failed to include adequate mitigation measures and improperly deferred mitigation; and (6) City failed to conduct an analysis of consistency with the general plan.

A. *Standards of Review*

With respect to the CEQA-related claims, "[i]n determining whether the agency complied with the required procedures and whether the agency's findings are supported by substantial evidence, the trial court and the appellate courts essentially perform identical roles." (*Environmental Protection Information Center v. California Dept. of Forestry and Fire Protection* (2008) 44 Cal.4th 459, 479.) Both courts review the agency's compliance under an abuse of discretion standard. "In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' " (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426 [quoting Pub. Resources Code, § 21168.5].) "Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' " (*Ibid.*) "An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: the appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo." (*Id.* at p. 427.)

A different standard of review applies to the allegation of inconsistency with the general plan. "The standard for judicial review of administrative decisions by local public agencies with respect to consistency with applicable general plans 'is whether the local adopting agency has acted arbitrarily, capriciously, or without evidentiary basis.' " (*San Franciscans Upholding the Downtown Plan v. City & County of San Francisco* (2002) 102 Cal.App.4th 656, 677 [quoting *Concerned Citizens of Calaveras County v. Board of Supervisors* (1985) 166 Cal.App.3d 90, 96].) "A city's findings that the project is consistent with its general plan can be reversed only if it is based on evidence from which no reasonable person could have reached the

6

same conclusion." (*A Local & Regional Monitor v. City of Los Angeles* (1993) 16 Cal.App.4th 630, 648.) "[B]ecause the question of substantial compliance with the general plan is one of law, this court need not give deference to the conclusion of the trial court." (*San Franciscans Upholding the Downtown Plan, supra*, 102 Cal.App.4th at p. 677.)

B. *The Trial Court's Discharge of the Writ*

Appellants contend the trial court erred in discharging the writ because City failed to comply with CEQA requirements not mentioned in the court's November 9, 2011 order. They complain that City simply voided and readopted the same actions it took prior to the court's order without proper consideration for CEQA procedure. City contends that it was only required to remedy the sole CEQA violation found by the trial court—that City erred by passing the December 6, 2010 resolution before first approving the negative declaration. In City's view, its violation of CEQA was strictly a matter of mistiming. City argues that it fully remedied this violation by readopting the funding resolution after first reapproving the negative declaration. But appellants argue that rather than simply readopting the prior actions, City should have remedied other alleged CEQA violations, which appellants then set forth in subsequent sections of their opening brief. We will individually consider those alleged violations below.

The trial court was required to address any and all alleged grounds for noncompliance. (Pub. Resources Code, § 21005, subd. (c).) Public Resources Code section 21168.9 specifically controlled the content of the court's order, providing that if a court finds a violation of CEQA, the court's order must include "[a] mandate that the public agency take specific action as may be necessary to bring the determination, finding, or decision into compliance with this division." (Pub. Resources Code, § 21168.9, subd. (a)(3).) The statute further circumscribes the content of the order, requiring that "[a]ny order pursuant to subdivision (a) shall include *only those mandates which are necessary to achieve compliance with this division and only those specific project activities in noncompliance with this division.*" (Pub. Resources Code, § 21168.9, subd. (b).) (Italics added.)

The court's order described only one violation of CEQA. The court found that the December 6, 2010 resolution constituted an approval under CEQA Guidelines, and that it was made prior to the required review. Accordingly, the court's judgment included mandates under Public Resources Code section 21168.9 requiring City to (1) void the resolution and the approval of the negative declaration and capital

7

improvements program; and (2) reconsider those decisions after appropriate CEQA review. The court found no other procedural violations, and the court found no defects in the content or substance of the negative declaration. If City had violated CEQA on any of the other grounds alleged by appellants, Public Resources Code section 21168.9 would have required the court to specify those violations and mandate remedies for them. We can infer from the trial court's silence on these other matters that it found no such violations.

City's remedial actions, aimed squarely at the specified violation, were entirely appropriate in light of the court's order. (See *Protect The Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1112 [court's finding of a deficiency in an environmental impact report does not require the agency to start the review process anew; rather, the agency need only correct the identified deficiency].) The trial court's discharge of the writ was therefore consistent with its November 9, 2011 order.

We now turn to appellants' claims regarding specific CEQA violations not identified in the trial court's order.

C. *The Negative Declaration's Description of the Project*

Appellants contend the negative declaration did not adequately describe the Project because it did not reference the capital improvements program or the VTA grant application.[2] According to appellants, CEQA required City to perform environmental review specific to the VTA grant application process and capital improvements program funding mechanism. Appellants also argue that the "the Project approvals did not include or evaluate the required approval or design review by Caltrans, the responsible agency, to address construction impacts, thereby causing the Project description to fail to adequately describe the existing environment." City contends that the required CEQA review pertains only to the underlying physical activity that potentially affects the environment, not City's administrative decisions and approvals.

Under CEQA Guidelines, a negative declaration must include "(a) A brief description, including a commonly used name for the project, if any; (b) The location of the project, preferably shown on a map, and

---

[2] At oral argument, appellants claimed the negative declaration also failed to adequately describe the physical impacts of construction. Appellants made no such argument in their opening brief. Their reply brief obliquely mentions it in passing. We need not consider any point made for the first time at oral argument or in an appellant's reply brief. (*Kinney v. Vaccari* (1980) 27 Cal.3d 348, 356, fn. 6; *Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11.) We deem it waived. Regardless, the project description did consider the impact of construction on the physical environment, including air quality, water quality, noise levels, and potential archeological finds.

8

the name of the project proponent; (c) A proposed finding that the project will not have a significant effect on the environment; (d) An attached copy of the initial study documenting reasons to support the finding; and (e) Mitigation measures, if any, included in the project to avoid potentially significant effects." (Cal. Code Regs. tit. 14, § 15071; *Long Beach Sav. & Loan Assn. v. Long Beach Redevelopment Agency* (1986) 188 Cal.App.3d 249, 259.) A negative declaration is inappropriate where the agency has failed to provide an accurate project description. (*Center for Sierra Nevada Conservation v. County of El Dorado* (2012) 202 Cal.App.4th 1156, 1171.) "An accurate, stable and finite project description is the sine qua non of an informative and legally sufficient [environmental report]." (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 193.)

Appellants do not argue here that the negative declaration inadequately described the physical elements of the Project. At issue is whether City was required to include certain administrative decisions or approvals in its description of the Project. Public Resources Code section 21065 defines "project" as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment. . . ." and which includes certain specified activities. CEQA Guidelines specify that "project" does *not* include (1) "[t]he creation of government funding mechanisms or other government fiscal activities, which do not involve any commitment to any specific project which may result in a potentially significant physical impact on the environment" or (2) "[o]rganizational or administrative activities of governments that will not result in direct or indirect physical changes in the environment." (Cal. Code Regs. tit. 14, § 15378, subd. (b).) Furthermore, " 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (Cal. Code Regs. tit. 14, § 15378, subd. (c).)

Case law likewise has noted that "project" "refers to the underlying activity which may be subject to approval by one or more governmental agencies; it does not refer to each of the several approvals sequentially issued by different agencies." (*Committee for a Progressive Gilroy v. State Water Resources Control Bd.* (1987) 192 Cal.App.3d 847, 863.) Similarly, "project" refers to " 'the whole of an action, which has a potential for resulting in a physical change in the environment, directly or ultimately. . . .' " (*Kaufman & Broad-South Bay, Inc. v. Morgan Hill Unified School Dist.* (1992) 9 Cal.App.4th 464, 470 [forming a

9

"community facilities district" for school financing does not constitute a project, and quoting Cal. Code Regs. tit. 14, § 15378, subd. (a)(1)].)

Here, the "underlying activity" potentially impacting the environment consists of the streetscape enhancement improvements described above. The negative declaration and the attached study describe the physical aspects of these improvements and analyze their potential impacts in detail. The documents provide (1) a commonly used named for the project, e.g. "California Streetscape Improvements—Phase II"; (2) a map showing the location; (3) a finding that the Project could not have a significant impact on the environment; and (4) an initial study documenting the reasons to support the finding. Appellants do not dispute the accuracy of any of these descriptions or findings.

Rather, appellants argue that *Nelson v. County of Kern* (2010) 190 Cal.App.4th 252 (*Nelson*) required the negative declaration to describe the resolution approving the VTA grant application and the approval of the capital improvements program. *Nelson* does not support this contention. The petitioners in *Nelson* challenged the adequacy of an environmental analysis concerning a surface mining operation on 40 acres of federally owned land. (*Id.* at p. 259.) The project consisted of a plan to mine calcite marble for 30 years, followed by reclamation to restore the land afterwards. Because the mining was to take place on federal land, the county argued that the Bureau of Land Management had sole permitting power over the mining operation. (*Id.* at pp. 259-260.) Accordingly, the county limited its environmental review to the reclamation portion of the project and adopted a negative declaration. The court of appeal, rejecting this argument, held that the county was required to evaluate the impact of the surface-mining project as a whole, including the impacts of the mining itself. (*Id.* at p. 260.)

*Nelson* is readily distinguishable from the case at bar. The improperly omitted portion of the project in *Nelson* consisted of a 30-year mining operation with obvious direct and indirect physical impacts. The omitted actions here—the passage of a resolution and the approval of a financing mechanism—had no direct physical impacts whatsoever. To the extent these actions had indirect physical effects, e.g. by allowing the Project to proceed, these effects consisted entirely of the physical impacts of the approved street enhancement activities, which were already analyzed in the negative declaration and the attached initial

10

study.[3]  In other words, the negative declaration properly reviewed the potential impacts of the project *as a whole*.  Therefore, appellants' contention that City should have separately reviewed the impact of purely non-physical, administrative activities associated with the Project—the physical impacts of which had already been reviewed in their entirety—lacks merit.

Appellants also contend that "the Project approvals did not include or evaluate the required approval or design review by Caltrans, the responsible agency, to address construction impacts, thereby causing the Project description to fail to adequately describe the existing environment."  In support of this claim, appellants cite to Public Resources Code section 21060.5, defining "environment" as "the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance."  But this citation does not support—or even elucidate—appellants' argument.  Equally unhelpful is appellants' citation to *Save our Peninsula Committee v. Monterey County Board of Supervisors* (2001) 87 Cal.App.4th 99, which concerned the physical impact of a proposed housing development on the region's water supply.  Absent any comprehensible explanation of this argument, we will not address it further.  (*Berger v. Godden* (1985) 163 Cal.App.3d 1113, 1117 [appellant who fails "to advance any pertinent or intelligible legal argument" abandons the claim].)

We conclude that City did not abuse its discretion by excluding the VTA grant application and capital improvements program from the negative declaration.

D. *Notice Requirements*

Appellants contend City "failed to give proper notice of, or to indicate its intention to adopt and make available for public review" the negative declaration.  Appellants point to the November 28, 2011 City Council Meeting at which City readopted the negative declaration and reapproved the capital improvements program.  Both parties agree that the content of the negative declaration was identical to the version of the declaration first approved eight months earlier on February 14, 2011.  However, appellants claim notice of

---

[3] In any case, "indirect effects" refer to physically caused impacts.  " 'Indirect' means 'not immediately related to the project, but . . . caused indirectly by the project' such as a physical change caused by a direct physical change."  (*County Sanitation Dist. No. 2 v. County of Kern* (2005) 127 Cal.App.4th 1544, 1581 [quoting Cal. Code Regs. tit. 14, § 15064, subd. (d)(2)].)  For example, indirect effects include the health effects of increased air pollution caused by a project.  (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1220.)

11

the actions taken on November 28 was not provided until November 22, 2011, six days prior to the meeting. Appellants contend this constituted a violation of CEQA's notice requirements. City contends it provided adequate notice because the negative declaration had already been circulated for public review once, and recirculation was not required.

"The public review period for a proposed negative declaration or proposed mitigated negative declaration may not be less than 20 days. If the proposed negative declaration or proposed mitigated negative declaration is submitted to the State Clearinghouse for review, the review period shall be at least 30 days. . . ." (Pub. Resources Code, § 21091, subd. (b); Cal. Code Regs. tit. 14, § 15105.) City first provided notice of intent to adopt the negative declaration and circulated a draft of it for public review from December 17, 2010 until January 18, 2011. Therefore, City initially circulated the negative declaration for an adequate period of time. Appellants do not dispute this. At issue here is whether City was required to recirculate the negative declaration for public review before reapproving it on November 28, 2011.

"A lead agency is required to recirculate a negative declaration when the document must be substantially revised after public notice of its availability has previously been given pursuant to Section 15072, but prior to its adoption." (Cal. Code Regs. tit. 14, § 15073.5, subd. (a).) "Substantial revision" means "[a] new, avoidable significant effect is identified and mitigation measures or project revisions must be added. . ." or "[t]he lead agency determines that the proposed mitigation measures or project revisions will not reduce potential effects to less than significance and new measures or revisions must be required." (Cal. Code Regs. tit. 14, § 15073.5, subd. (b).)

City had previously provided adequate public notice of the negative declaration. As appellants concede, the reapproved version of the negative declaration was identical to the negative declaration that had already been circulated. There being no substantial revisions to the document, City was not required to recirculate it.

E. *Segmentation of the Project*

Appellants contend City improperly segmented the Project by reapproving the negative declaration and capital improvements program on February 14, 2011, without reevaluating the Project design, construction, and impacts. As part of this argument, appellants repeat their claims, analyzed above, that the negative declaration did not adequately describe the Project because it did not describe City's administrative

12

actions.  Appellants allege that as a consequence of this inadequate description, the reapproved negative declaration is "not associated with any approval" of the Project, "resulting in a disjointed chopped-up and incomplete environmental review. . . ."  In response, City contends appellants are relying on a misconceived notion of segmentation.

"Segmentation" refers to the division of a project into pieces, thereby avoiding review of the physical impact of the project as a whole.  "A public agency may not divide a single project into smaller individual projects in order to avoid its responsibility to consider the environmental impacts of the project as a whole." (*Sierra Club v. West Side Irrigation Dist.* (2005) 128 Cal.App.4th 690, 698.)  "CEQA mandates that environmental considerations do not become submerged by chopping a large project into many little ones, each with a potential impact on the environment, which cumulatively may have disastrous consequences." (*Burbank-Glendale-Pasadena Airport Authority v. Hensler* (1991) 233 Cal.App.3d 577, 592.)  "A project under CEQA is the whole of an action which has a potential for resulting in a *physical change in the environment*, directly or ultimately, and includes the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies."  (*Ibid.*)  (Italics added.)

City did not segment the Project simply by reapproving it.  The required review concerned those activities with "a potential for resulting in a *physical change in the environment*."  (*Burbank-Glendale-Pasadena Airport Authority, supra,* at p. 592.)  The environmental impact of the Project as a whole consisted of the physical effects of the streetscape enhancement elements—e.g. the impact of the lane reduction on traffic patterns, inter alia.  The administrative actions by themselves had no physical effects.  Appellants offer no explanation as to how City avoided reviewing the effects of the cumulative physical impacts of the proposed streetscape enhancement elements as a whole simply by reapproving the Project.  At no point did City divide up any of the physical elements of the Project into separate projects.  To the contrary, the scope of the environmental review for the Project as a whole remained constant throughout the entire process because the proposed underlying physical activity remained substantially the same.

We conclude that City did not abuse its discretion in this matter.  Accordingly, we reject appellants' claims of improper segmentation.

F. *Mitigation Measures*

13

Appellants contend City failed to include adequate mitigation measure of traffic and economic impacts in the negative declaration. Specifically, appellants argue that the negative declaration did not consider the impact of construction and lane reduction on commercial deliveries and customers' access to businesses along the avenue. Appellants further contend City improperly deferred mitigation of construction impacts by indicating that these impacts would be addressed subsequently. City contends appellants waived these claims by failing to develop them before the trial court. City further argues that even if appellant did not waive these claims, economic impacts alone are insufficient to require mitigation.

We will consider appellants' claims pertaining to mitigation. Appellant initially put forth these claims in seven paragraphs of their verified petition, specifically alleging potential economic impacts on California avenue businesses due to disruption of commercial activity. Appellants further addressed these claims generally in their opening brief and in oral argument at the hearing before the trial court. Appellants also raised these concerns at public meetings and in correspondence with City, providing ample notice that the facts underlying the claims were at issue. We find the record sufficient to support these claims on appeal.

As to the substance of appellants' claims, we find them lacking. "[E]conomic and social changes are not, in themselves, significant effects on the environment." (*Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004, 1019.) "[T]he economic and social effects of proposed projects are outside CEQA's purview." (*Bakersfield Citizens for Local Control v. City of Bakersfield, supra,* 124 Cal.App.4th at p. 1205.) "Economic or social effects of a project shall not be treated as significant effects on the environment." (Cal. Code Regs. tit. 14, § 15131, subd. (a).)

An agency must consider economic impacts only to the extent they may be a factor in a chain of causation involving environmental impacts. "Economic or social effects of a project may be used to determine the significance of physical changes caused by the project." (Cal. Code Regs. tit. 14, § 15131, subd. (b).) "An EIR may trace a chain of cause and effect from a proposed decision on a project through anticipated economic or social changes resulting from the project to physical changes caused in turn by the economic or social changes." (Cal. Code Regs. tit. 14, § 15131, subd. (a).)

For example, if a project's economic effects result in urban decay, environmental review must encompass the subsequent physical environmental effects of that urban decay. In *Bakersfield Citizens*, the petitioners alleged CEQA violations in the environmental review of two retail shopping centers in

14

southwestern Bakersfield.  (*Bakersfield Citizens*, *supra,* at p. 1193.)  The trial court concluded that CEQA required review of whether the shopping centers could indirectly result in urban decay or deterioration in the surrounding areas.  (*Id.* at p. 1195.)  On appeal, the court held that "if the forecasted economic or social effects of a proposed project directly or indirectly will lead to adverse physical changes in the environment, then CEQA requires disclosure and analysis of these resulting physical impacts."  (*Id.* at p. 1205.)  The court recognized a long line of cases upholding this rule.  (See, e.g., *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151; *Citizens for Quality Growth v. City of Mt. Shasta* (1988) 198 Cal.App.3d 433; *City of Pasadena v. State of California* (1993) 14 Cal.App.4th 810, disapproved on another ground in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559.)

Here, appellants do not contend that interference with their commercial activities will result in some other physical change to the environment.  Rather, they complain of the economic disruption itself.  For the reasons above, CEQA did not require City to consider economic impacts on that basis.

"Conversely, where economic and social effects result from a *physical change* that was itself caused by a proposed project, then these economic and social effects may be used to determine that the *physical change* constitutes a significant effect on the environment."  (*Bakersfield Citizens*, *supra*, at p. 1205, emphasis added.)  For example, "if the construction of a road and the resulting increase in noise in an area disturbed existing religious practices in the area, the disturbance of the religious practices could be used to determine that the construction and use of the road and the resulting noise would be significant effects on the environment."  (Cal. Code Regs. tit. 14, § 15131, subd. (b).)

Here, appellants contend that disruption to their business activities would result from interference with traffic and parking along the avenue.  Such economic disruption could be used to determine whether the Project could potentially impact traffic and parking, but that is not appellants' contention.  Indeed, that argument would fail, because City extensively reviewed the Project's impact on traffic and parking.  City commissioned a 300-page traffic study and concluded that parking and traffic on California Avenue would remain at acceptable levels even after the lane reduction.  As to the economic effects, City's review concluded the Project was expected to generate economic benefits to the City and area businesses as a result of increased vehicle and bicycle parking, enhanced pedestrian-centered features, and overall aesthetic improvements in the environment.  To the extent appellants' claims challenge the factual basis for these

15

findings, appellants present no evidence to the contrary. We find that City's findings on these matters are supported by substantial evidence. Accordingly, we conclude that City did not abuse its discretion in this matter.

G. *Consistency with the General Plan*

Appellants contend that state planning law required the capital improvements program to be consistent with the City General Plan, but that City failed to conduct a consistency analysis. City argues that it is a charter city and hence exempt from the Government Code provisions requiring consistency, but that it nonetheless made findings sufficient to show that the Project was consistent with the General Plan.

As a general matter, City correctly argues that it is exempt from certain Government Code provisions because City is a "charter city." "[Th]e planning law only applies certain minimal requirements to the general plans of charter cities." (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 784.) Specifically, Government Code section 65700 provides that "[t]he provisions of this chapter shall not apply to a charter city, except to the extent that the same may be adopted by charter or ordinance of the city. . . ." This provision "makes plain, however, that none of the planning law's procedural requirements, except the provision that the plan be adopted by resolution of the legislative body or planning commission, apply to charter cities." (*DeVita*, *supra*, at p. 784.)

City has adopted some portions of state planning law. As relevant here, City Municipal Code expressly adopts "[t]he provisions of Articles 7 and 8, Chapter 3 of Title 7 of the Government Code of the State of California, as enacted in 1953, as amended through 1959. . . ." (Palo Alto Mun. Code, § 19.04.020.) The only portion of this law that appellants claim requires consistency is a provision stating that "[t]he general plan shall be the guide for the capital improvement program insofar as the capital improvement program affects the physical development of the city." (Palo Alto Mun. Code, § 19.04.020.) Appellants cite no authority for the claim that this provision requires City to make findings of consistency with respect to the capital improvements program. Even assuming City was required to do so, its actions satisfied the lenient standard of review applied here.

" 'An action, program, or project is consistent with the general plan if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment.' " (*Corona-Norco Unified School Dist. v. City of Corona* (1993) 17 Cal.App.4th 985, 994 [quoting General Plan

16

Guidelines, p. 212, Governor's Office of Planning and Research, 1990].)  "A given project need not be in perfect conformity with each and every general plan policy."  (*Families Unafraid to Uphold Rural etc. County v. Board of Supervisors* (1998) 62 Cal.App.4th 1332, 1336.)  As the trial court noted, City made findings in reports to City Council and the Planning and Transportation Commission that the Project was consistent with the goals of City's general plan.  City Council's staff report for the February 14, 2011 meeting found that the general plan set forth three goals consistent with those of the Project:  (1) upgrading the visual quality of the street to attract businesses and visitors; (2) encouraging a mix of residential and non-residential uses at a scale of development that is comfortable for pedestrian use; and (3) improving the appearance of the street while preserving its "home town" character.  City's staff report to the Planning and Transportation Commission contained similar language.

City's findings need only be reversed if they are based on "evidence from which no reasonable person could have reached the same conclusion."  (*A Local & Regional Monitor v. City of Los Angeles, supra,* at p. 648.)  Appellants make no such showing here.  We find that City did not act "arbitrarily, capriciously, or without evidentiary basis."  (*San Franciscans Upholding the Downtown Plan v. City & County of San Francisco*, *supra*, at p. 677.)  Accordingly, we reject appellants' claim.

### III.    DISPOSITION

The judgment is affirmed.


_____
Márquez, J.



WE CONCUR:




17

_____
Elia, Acting P. J.


_____
Bamattre-Manoukian, J.